**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTONIA MAIORINI, et al.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 14-1613** |
| | : | |
| **FARMERS INSURANCE EXCHANGE,** | : | |
| **et al.** | : | |

**<u>MEMORANDUM OPINION</u>**

**SCHMEHL, J.**   **/s/ JLS**                                    **March 30, 2017**

Plaintiffs brought this action claiming their employment was terminated by defendants because of their age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq and the Pennsylvania Human Relations Act ("PHRA"), 43 P.C.S.A, § 951 et seq.  Plaintiff Reichardt also asserts a claim against defendants for retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 et seq. and the Federal and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. Presently before the Court are the defendants' motions for summary judgment. For the reasons that follow, both motions are granted.

**<u>STANDARD OF REVIEW</u>**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." <u>Am. Eagle Outfitters v. Lyle & Scott Ltd.</u>, 584 F.3d 575, 581 (3d Cir. 2009)(quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." <u>Pignataro v. Port Auth. of N.Y. and N.J.</u>, 593 F.3d 265, 268 (3d Cir. 2010) (citing <u>Reliance Ins. Co. v. Moessner</u>, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250.

## FACTUAL BACKGROUND

The following facts are either undisputed or construed in the light most favorable to plaintiffs:

1. Defendant Farmers Insurance Exchange sells auto insurance policies to individuals and businesses throughout the United States. Defendant Farmers Insurance Group is the parent of Farmers Insurance Exchange. Both defendants shall hereinafter be referred to as ("Farmers"). Farmers maintains an office in King of Prussia, Pennsylvania, where it employs claims representatives who administer claims made under individual home and auto policies. (App. Ex. 1, Duffy Decl. ¶4.) Both plaintiffs worked for Farmers as claims representatives at its King of Prussia office. (App. Ex. 1, Duffy Decl. ¶5.)

2. When an insured reports a loss to Farmers, that loss is referred to a claims representative who must: investigate the allegations; make an initial determination whether the

claim is covered under the policy and, if so, what the exposure may be; and then work quickly and efficiently to resolve the claim with both the insured and any third party seeking recovery for property damage or personal injury. (App. Ex. 1, Duffy Decl. ¶7.) Farmers generally divides claims into three categories:

☐ **_Direct_** Claims are those pursued by individuals who are not represented by an attorney. The claims representative works directly with the insured or third party to settle claims for property damage or personal injury.

☐ **_Attorney Represented_** Claims are those where the insured or third party seeking relief is represented by an attorney, but no actual litigation is pending. The claims representative works with the attorney representing the insured or third party to settle claims for property damage or personal injury.

☐ **_Litigation_** Claims, are those where a complaint has actually been filed in a court of law, or a demand for arbitration made. Farmers is represented by an attorney, and the claims representative manages Farmers' outside counsel. The claims representative works through Farmers' outside counsel to settle claims for property damage or personal injury with the insured or third party's attorney. (App. Ex. 1, Duffy Decl. ¶8.)

3. At Farmers, representatives generally worked exclusively on one of the above-type claims. (App. Ex. 1, Duffy Decl. ¶9.) The basic concept of claims management is the same for all three types of claims: investigate claims early to determine coverage and exposure, then work to promptly resolve the matters. (App. Ex. 1, Duffy Decl. ¶10.) However, claims brought by unpresented parties tend to be easier to resolve and settle faster. (Id.) Direct Claims representatives also regularly meet with the claimants face-to-face, requiring them to frequently

3

be out of the office. (App. Ex. 1, Duffy Decl. ¶11.) Therefore, Direct Claims representatives carry smaller pending lists (about 60-90 files) than Attorney Represented representatives (who carry about 175 files). (App. Ex. 1, Duffy Decl. ¶12.) Also, because they usually are easier to resolve, less experienced claims representatives generally start on Direct Claims, while more experienced representatives typically work on attorney represented files. (App. Ex. 1, Duffy Decl. ¶13.)

4. Farmers has developed "Liability Strategy and Standards" (the "Standards"), which establish the tasks that a Farmers' claims representative must perform as part of his/her job, the timeliness by which those tasks must be completed, and the manner in which the claims representative should document the performance and completion of these tasks. (App. Ex. 16, 7/9/10 Liability Strategy and Standards.)

5. In addition, the Pennsylvania Fair Claims Practice Act, 40 P.S. Ch. 4§ 1171 et. seq., and its implementing regulations, establishes stringent deadlines for insurance carriers to process claims. Under the statute, insurers must send claimants written notice acknowledging receipt of their claim within 10 business days. The insurer must also complete its investigation into the claim within 30 days, unless it can establish that meeting this deadline is not possible. If so, the insurer must send an explanation to the claimant why it cannot timely complete the investigation, and send status reports every 45 days until a decision is made. *See* Insurance Regulation §§ 146.5 and 146.6.

6. Julie Harmon ("Harmon") became Farmers' Pennsylvania State Manager on January 1, 2010. See Exh. C, Harmon Dep. at 20:15-21:7. At the time Farmers placed her in that position, Harmon was 36 years old. (Id. at 11:19-20.)

7. In her new capacity, Harmon was in charge of the King of Prussia and Pittsburgh offices, with her office located in King of Prussia, see Exh. 15, Phone Chart, FIE 00028 – the office to which both plaintiffs were reporting.

8. As Pennsylvania State Manager, Harmon became directly involved in virtually all management decisions in the King of Prussia office, taking it upon herself to directly review the files of the claims adjusters, see Exh. C, Harmon Dep. at 66:9-68:22 (showing her reviewing the files of plaintiffs); see also Exh. 16, Harmon email to Lewis dated May 15, 2012; dictating to the immediate supervisors how they should rate employees on their performance reviews; Exh. 17 (Harmon email instructing Lewis to rate Reichardt as "Partially Meets"); see also Exh. C, Harmon Dep. at 153:18-156:11; deciding when to place employees into the Corrective Action system, see Exh. C, Harmon Dep. at 106:11-17 (admitting her input into decisions to place both Reichardt and Maiorini into Corrective Action); and making the decisions as to which new employees should be hired. (See Exh. C, Harmon Dep. at 222:17-20; 50:16-21; 56:10-17; 57:19-24; 58:17-59:3; 60:2-61:2; 61:13-62:8; 62:13-63:6.)

9. Harmon testified that the decision to issue a corrective action against a particular claims representative was usually initiated by the representative's supervisor, but that "anybody" was entitled to initiate the action, including Harmon. (Pl. App Ex. C, Harmon Dep. Tr. 94.)

10. Harmon also testified that she made it her business to review audits that were performed on all the claim's representative's files. Id. Harmon testified that if she found something that she believed should require corrective action, Harmon would contact that individual's supervisor to see if the issue was a one- time event or part of a trend. (Id. at 94-95.)

11. During the years relevant to this litigation, Farmers prepared both mid-year and year-end performance evaluations for each of the claims adjusters working in the offices reporting to Harmon.  (See generally Exh. J, Lewis Dep. at 43:15-61:7.)

12. On these performance reviews, Farmers would rate the claims adjusters in a number of performance areas, such as "Behaviors;" "Total File Quality;" "Negotiation;" "Evaluation;" "In-person Contact (IPC);" "Early Contact Settlement" (ECS); and "Customer Eexperience." (See generally Exh. J, Lewis Dep. at 43:15-61:7.)

13. "Behaviors" was the only subjective category and was an overall assessment of the claims representatives' performance, and specifically evaluated whether the representative required more or less support or supervision than someone of his/her experience should need. The remaining categories were objective or numeric metrics that varied each year. (See, e.g., Pl. App Ex. J, Lewis Dep. Tr. 80: 13-82:4; 127:2-128:10.)

14. Farmers' ratings of the claims representatives typically ranged from high to low as follows: "Exceeds;" "Meets" (sometimes referred to as "Fully Meets"); "Partially Meets;" and "Below Expectations." (See generally Exh. J, Lewis Dep. at 43:15-61:7.) All four ratings were not applicable to every objective criteria rated in the annual evaluation. Instead, for many of these categories, employees were simply rated as either "Fully Meets" or "Below Expectations"—i.e., they simply pass or fail. (See, e.g., Pl. App Ex. J, Lewis Dep. Tr. 75:6-13.)

15. In many cases, a numerical score was correlated with the ratings given, so that "Exceeds" was also referred to as a "4;" "Meets" (or "Fully Meets") as a "3"; "Partially Meets" as a "2"; and "Below Expectations" as a "1." (See generally Exh. J, Lewis Dep. at 43:15-61:7.)

16. Based on the ratings in each of the performance areas so rated, Farmers would then give an "Overall Rating," evaluating the employee's total performance for the year. (See generally Exh. J, Lewis Dep. at 43:15-61:7.)

**Plaintiff Deborah Ann Reichardt**

17. Reichardt started her insurance industry career with Travelers Insurance in 1987; became a claims analyst in 1989; then a claims representative in 1994; and then was promoted to the position of litigation representative at Travelers in 2000, a position she held for the next two years. (See Exh. A, Reichardt Dep. at 13:5-15:3; 16:14-16; 19:15-20:7. See also Exh. 99, Declaration of Deborah Ann Reichardt at ¶ 2.)

18. After leaving Travelers, Reichardt began working as a claims representative with Farmers on May 13, 2002 and continued to work for Farmers for the next ten years until Farmers terminated her employment in August, 2012. (See Exh. 1, Nye/Mercer email dated April 29, 2002, FIE 00355.) (See also Exh. 99, Reichardt Declaration at ¶ 3.)

19. Thus, prior to Farmers' decision to terminate her employment in 2012, Reichardt, who was 48 years old at the time of her termination, had worked handling insurance claims for twenty three years. (See  Exh. 99, Reichardt Declaration at 113.)

20.  During her employment with Farmers, Reichardt handled both the claims that proceeded to litigation, which, according to Farmers, are the most complex claims handled by claims representatives, (see Exh. B, Bode Dep. at 129:9 13; 187:13 19), as well as "direct" claims, in which the claims representative deals directly with both the insured and/or

other parties making claims. (See Exh. C, Harmon Dep. at 105:19 106:3.) (See also Exh. 99, Reichardt Declaration at ¶ 4.)

21.  In 2009, Reichardt's supervisor, Michael Scheibner ("Scheibner"), was critical of Reichardt's response to coaching, stating, Reichardt often "becomes defensive and complains to others that I'm being too strict." (See Pl. App Ex. 5, Reichardt 2009 Year-End Assessment, pg. 1.) Scheibner also noted that Reichardt had a tendency to fail to set timely reserves. (Id. at p. 4.) Scheibner closed his review stating, "Debbie does need to do better with taking criticism on file handling going forward. As she knows we have a very intricate system of file auditing in the SCR program." (Id. at p. 6.)

22. During her first eight years of her employment with Farmers, Reichardt had never been placed on any formal Corrective Action. (See Exh. D, Scheibner Dep. at 30:19-23;48:21-49:7.)

23. Reichardt was described by a co-worker from 2002, Michael Russell ("Russell"), as hard-working, very professional and very responsible, a team player and the "go-to person" in the office on the defendant's computerized claims handling process. Russell also testified that from a claims handling perspective, Reichardt's files "were the easiest ones to assume, because, you know, the work was done, things were, you know, coded properly, and it was really easy just to pick up and run with it." Russell stated that Reichardt's files were in better condition than those of the other claims representatives. (See Exh. E, Russell Dep. at 46:12-52:4.)

24. Russell also admitted that he had never seen Reichardt's or any claims representative's entire file. Russell also admitted that he had never audited or supervised Reichardt or any other claims representative and that he would not be in a position to make a

comparison of the overall quality of the files of the other claims representatives. (Pl. App Ex. E., Russell Dep. Tr. 69:12-70:16.)

25. In the fall of 2009, Farmers acquired AIG's Personal Auto Insurance Group and subsequently consolidated its own and AIG's claims operations into one operation. (App. Ex. 1, Duffy  Decl. ¶16.) This required consolidating thousands of employees and numerous locations into one integrated operation. (Id.) Following the acquisition, James Fiorucci ("Fiorucci"), who had come from AIG, was appointed Director of the Northeast region. (App

Ex. 1, Duffy Decl. ¶17; App. Ex. 2, Harmon Dep. Tr.32:9-11; Ex. 3, Duffy Dep. Tr. 25.)

26. Neither AIG nor Fiorruci favored work-from-home arrangements. Fiorruci also believed that in order for the integration of the AIG and Farmers employees to be successful, people would need to work together in an office environment, where it would be easier to meet one another and collaborate. (App. Ex. 2, Harmon Tr. 145:2-145:15; 225:8-226:24.)

27. In 2010, Fiorucci advised the State Directors reporting to him that Farmers would be modifying its policy to reflect that working from home would be the exception, not the rule. (App. Ex. 2, Harmon Dep. Tr. 226:10-228:3.) Under the revised policy, only employees who had demonstrated an ability to perform with minimal supervision and had a performance rating of "meets expectations" would even be considered for a work-from-home arrangement. (Id.; App. Ex. 4, Alternative Work Arrangement Policy.) Fiorucci directed his State Managers and their subordinates to identify individuals who had been working from home, but should now be reporting to a corporate office. (App. Ex. 1, Duffy Decl. ¶17.)

28. For many years, Farmers maintained a policy that permitted claims representatives, including Reichardt, to work from home. (App. Ex. 1, Duffy Decl. ¶15.)

29. Farmers permitted Reichardt to work from home at the time it hired her in May, 2002 until 2010 when management and philosophy changed and everyone, with some exceptions, who lived within a reasonable distance of the King of Prussia office was required to report. (Harmon Dep. at 144-146; Reichardt Dep. at 32-34.)

30. In June 2010, Harmon instructed Reichardt's supervisor Scheibner, to tell Reichardt that, on account of "performance problems" she would have to start reporting into the King of Prussia office five days a week. (See Exh. A, Reichardt Dep. at 49:20-50:7.)

31. This was the first time in her career with Farmers that anyone in Farmers' management had ever claimed there were any issues with her "performance." (See Exh. D, Scheibner Dep. at 30:19-23; 48:21-49:7.)

32. Reichardt told Scheibner that, because of her bad neck and back which caused numbness in her arms, she was unable to sit at a desk forty hours a week, particularly given her commute of an hour and fifteen minutes each way from Birdsboro to King of Prussia. (See Exh. A, Reichardt Dep. at 49:25-50:10; 69:3-10.) She asked him why she was being required to come into the office five days a week when there were two other claims representatives, Gillian Bressi ("Bressi") and Capri Bonczek ("Bonczek"), who also worked from home but were not being required to now start reporting to the office. (Id. at 50:7-12; 69:11-16.)

33. Bressi and Bonczek are both younger than Reichardt, with Bressi being 33 years old at that time, and Bonczek being 38 years old. (See Exh. 19, Defendant Farmers First Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories and First Request for the Production of Documents.)

10

34. In addition to raising her concerns to Scheibner, Reichardt also contacted Joseph Lewis ("Lewis"), who was set to become her supervisor in July 2010, to tell him she had "concerns about [her] medical problems with my neck and back and coming in the office that I need to talk with you about." (See Exh. 56, Reichardt email to Lewis dated June 24, 2010, FIE 02557.)

35. Reichardt also submitted a letter to Lewis from her physician, Dr. Stephen Banco, dated June 29, 2010 that corroborated the fact that, due to her recent surgery, "[Reichardt] is not physically able to work in an office for greater than two days a week." (See Exh. 57, Reichardt email to Lewis dated July 2, 2010 attaching letter from Dr. Banco, FIE 02561-02562.)

36. On July 6, 2010, Reichardt received a letter from Jill Moravitz ("Moravitz") of Farmers' Human Resources Department confirming the decision by Reichardt's managers now requiring that she report daily to the office to work because of her "work performance" and a "change in management philosophy." (See Exh. 54.)

37. In her letter, Moravitz also explained that, in order to appropriately evaluate Reichardt's request for the accommodation of working remotely, Farmers needed additional information about the exact nature of her condition and physical limitations and the need for any accommodations. (App. Ex. 8, 7/6/10 Memo to D. Reichardt from J. Moravitz.) Reichardt was permitted to continue working remotely while she obtained that information. (Id.)

38. On July 14, 2010, Reichardt responded by letter to Moravitz, explaining that this was the first time in the 23 years she had been working in the insurance industry, including all her years with Farmers, that her performance had ever been questioned; that she had left her previous job at Travelers because of assurances by Farmers that "she could work from home" on account of the medical issues with her neck and back, of which she informed Farmers at the time she was

hired; that she felt it unfair that she was being forced to now report to the office when management was allowing Bonczek to continue to work from her home; and she felt she was being discriminated against because of [her] medical condition." (See Exh. 59, Reichardt letter to Moravitz dated July 14, 2010 at FIE 00451.)

39. On July 21, 2010, Reichardt also contacted Charisse Davis of Farmers' Human Resources Department to discuss, and hopefully get resolved, her concerns about suddenly being required to daily report to the office. (See Exh. 60, July 20-21, 2010 email chain, FIE 02872-02876.)

40. A week after Reichardt sent Moravitz her concerns of discrimination, Harmon sent an email to Reichardt's supervisor Lewis, second-level supervisor Mary Ellen Duffy ("Duffy"), and former supervisor Scheibner that read as follows: "Debbie [Reichardt] cannot go on thinking that the issues you previously discussed with her and documented were not performance issues." (See Exh. 61, Harmon email to Lewis, Scheibner and Duffy dated July, 21, 2010, FIE 02812-02813.)

41. Following up on that email, on July 26, 2010, Harmon initiated a phone conference with Reichardt, in which Scheibner and Moravitz also participated, in which Harmon proceeded to detail a number of performance deficiencies she claimed Reichardt had. (See Exhibit D, Scheibner Dep. at 44:16-21; 48:5-18; 50:19-51:17.)

42. Immediately thereafter, Harmon memorialized the contents of that call in an email sent directly by Harmon to Reichardt on July 28, 2010 (with a copy to Scheibner and Moravitz) in which she admonished Reichardt about these performance deficiencies. (See Exh. C, Harmon Dep. at 236:17-238:3.) (See also Exh. 62, Harmon email to Reichardt dated July 28, 2010, FIE 21916-21918.)

43. The performance deficiencies included: 1)"the incorrect drafting of both disclaimer and reservation of rights letters, on the same claims, at the same time;" 2) "inconsistency in file audit results;" 3) on one claim, discussing with the "claimant attorney information potential adverse to the insured;" 4) failure to return phone calls; 5) failure to properly code  reserves; 6) the need to claim ownership of a file once it is assigned.  (Id.)

44. Scheibner admitted that none of the issues raised by Harmon in her call and email to Reichardt had ever been raised by him on Reichardt's 2009 Year-End Performance Review, given to her in March, 2010. (See Exh. D, Scheibner Dep. at 57:14-19.)

45.  In the 2010 Mid-Year Review issued to her by Scheibner on or around August 4, 2010, Reichardt was given a "Needs Improvement" in Behavior; a "Meets" in Total File Quality; a "Meets" in Negotiation; and an "Exceeds" in Evaluation. (See Exh. 7, Reichardt 2010 Mid-Year Review, FIE 00615-00620.) Other than the rating on Evaluation, these ratings represented a downgrade in every category as compared to plaintiff Reichardt's 2009 Year-End Assessment. (See Exh. 5, Reichardt 2009 Year-End Assessment, FIE 00609-00614.)

46. Scheibner acknowledged that the issues noted in the 2010 Mid-Year Review were issues of "focus and consistency" related to Reichardt's performance in the first half of 2010. (Pl. App. Ex. D, Scheibner Dep. Tr. 83:13-85:19.) Scheibner was concerned that the issue he had observed could eventually necessitate formal performance management if not corrected. (App. Ex. 5, Scheibner Dep. Tr. 53:13-18; 83:13-85:5; Ex. 6, 7/28/10 Email from J. Harmon to J. Lewis and M. Duffy.). Scheibner was older than Reichardt when he raised these concerns (52 years old). (App. Ex. 5, Scheibner Dep. Tr. 10:10-11.)

47.  In the weeks and months thereafter, Harmon proceeded to further escalate her

monitoring of Reichardt's performance, which included criticism in an email on August 16, 2010 about a single mistake on one file: "[D]uring the recent compliance audit completed on status letters, 1 file of the 1 file audited was not in compliance. The expectation is 100% compliance. You have been previously advised of this issue on 9/30/09 and 2/24/10." (See Exh. C, Harmon Dep. at 247:14-248:6.) (See also Exh. 63, Harmon/Reichardt email exchange dated August 16, 2010, at FIE 03054-03055; Exh. 99, Reichardt Declaration at ¶ 28.)

48. On August 31, 2010, Reichardt provided Moravitz with a letter from her physician, David W. Allen, M.D., F.A.C.S., Neurosurgery, P.C. who wrote that he had been treating Reichardt for "severe cervical and lumbar disc degeneration that has required surgery." Dr. Allen further wrote that Reichardt suffers from "bilateral numbness," in her arms and has been diagnosed with "chronic pain syndrome." According to Dr. Allen, working from home would allow Reichardt to avoid driving to work and from work, and also permit her to rest her neck and back whenever necessary. Dr. Allen wrote that working from home would be the only accommodation Reichardt would need, whenever necessary. (App. Ex. 10, 8/31/10 Note from Dr. Allen.)

49. On September 8, 2010, Moravitz notified Reichardt by e-mail that her accommodation had been approved, and she would be permitted to work from home three days per week, but that she would be required to work in the office two days per week. (Id.) (App. Ex. 11, 9/8/10 Emails Between D. Reichardt and J. Moravitz.)

50. Reichardt never asked for any further accommodation, nor advised Farmers that this arrangement was not suitable. (App. Ex. 9, Reichardt Dep. Tr. 79:10-80:15.)

51. On November 2, 2010, Harmon sent an email to Lewis criticizing one of Reichardt's files because "Medicare procedures were not followed." (See Exh. 64, Harmon/Lewis email chain dated November 2, 2010, FIE 22313.)

52. Harmon testified that "I was not going through her files specifically. This was a file that came to my attention, for whatever reason. It might have shown up on a Medicare report as something not done that was brought to my attention. It might have been a random review of the operation. But at no point did I specifically decide I'm going to go through Debbie's files and find deficiencies within her files." (Pl. App. Ex. C, Harmon Dep. Tr. 252:10-253:3.)

53. On December 8, 2010, after reporting to management the previous day that she was now also experiencing symptoms of carpal tunnel syndrome, Reichardt filed an Employee Injury Report and indicated her intention to file a Workers' Compensation claim. (See Exh. 65, Employee Injury/Incident Report dated December 8, 2010, FIE 00466.) (See also Exh. A, Reichardt Dep. at 98:14-99:4; Exh. 66, Harmon/Duffy email chain dated December 8, 2010, FIE 03874-03876 and 03884.)

54. Upon being informed of that claim, Harmon responded to Duffy as follows: "Does she [Reichardt] understand that she is to continue to work until taken out of work by a dr - and all performance expectations remain in place? Please make sure Joe [Lewis] is documenting any and all conversations." (See Exh. 66.)

55. On December 14, 2010, Harmon informed Lewis that she was putting Reichardt "in as a PM [Partially Meets] for both Behaviors and Support as your write up indicates that she is requiring a higher level of support than would be expected with her level of experience." (See Exh. 67, Harmon/Lewis email chain with spreadsheet, FIE 21961-21965 and FIE 21967.)

56. In 2010, Farmers was audited by the Pennsylvania Department of Insurance (DOI"),
and received an adverse finding which noted among other things, that claims representatives in
the King of Prussia office were not timely sending DOI status letters, as required by law. (Supp.
App. Ex. 5, Report of Market Conduct Examination of Bristol West Insurance.)  A DOI delay
letter is a letter sent by an adjuster to insureds, claimants, and/or attorneys within 30 days of a
claim being filed in order to inform them why the claim had not yet been closed; the causes for
the delay; and the approximate timeline when the claim should be closed. (See Exh. F, Maiorini
Dep. at 82:18-25. Company, FIE 22662-22727; Supp. App. Ex. 6, Commonwealth of
Pennsylvania Insurance Department, Market Conduct Examination Report of 21st Century
Indemnity Insurance Company, FIE 22728-22785.)

57. To address the DOI findings, Farmers implemented a remedial plan, which included
placing any claims representatives who failed to send a timely DOI letter on official performance
warning. (Pl. App Ex. C, Harmon Dep. Tr. 89:16- 91:19.) This practice remained in effect from
the fall of 2010, thru late 2011. During this time all employees, regardless of age, who failed to
timely send a DOI letter were placed on formal warning.

58. As the King of Prussia office's compliance with this legal requirement improved,
Farmers stopped issuing warning letters for a single violation. Rather, Farmers viewed failures to
send such a letter as part of overall performance management, i.e., was it indicative of a failure
to proactively and properly manage files. (Pl. App Ex. C, Harmon Dep. Tr. 91:9-94:10.)

59.  On January 3, 2011, Harmon placed Reichardt on Corrective Action
for failing to send a timely DOI status letter, (see Exh. 68, Reichardt Warning, FIE 00320) - the
first time Reichardt had been given such a warning during her entire career. (See ¶ 7 above.)

60. On January 6, 2011, three days after Reichardt was put on Corrective

**16**

Action for failing to send a timely DOI status letter, Duffy told Lewis that Reichardt "need[s] to feel pushed." (See Exh. K, Duffy Dep. at 56:4-8.)

61.     On Reichardt's Year-End Assessment for the year 2010, given to her on March 24, 2011, (see Exh. J, Lewis Dep. at 62:13-23), she was rated as a "Partially Meets" in "Behavior" and therefore  as an overall "Partially Meets" despite exceeding all of the goals for claims adjusters on the objective categories measuring her performance, (see Exh. 7, Reichardt 2010 Year-End Assessment.) Lewis specifically noted in the "Behavior" category that "[o]verall for the year of 2010, I did not fully see the level of support that I would expect from Debbie based on her experience level. There were areas of opportunity that I would not expect to be finding as Debbie is an experienced claims representative. The areas of opportunity included: Initial Cleans past due, Incomplete CLEANS… Updated Cleans past due, and Delays in activity. (Id.); (See also Exh. A, Reichardt Dep. at 87:2-11; Exh. 51, Open Files Chart, FIE 02278-02285 (showing Reichardt had more open files than the majority of claims adjusters)).

62.     Despite the fact that Reichardt successfully completed her Corrective Action period on April 6, 2011, and despite the fact that Farmers has admitted that every adjuster had made mistakes in nearly every one of his or her claims, (see ¶ 67 above), Farmers immediately put Reichardt back into Corrective Action the very same day (April 6, 2011), purportedly because of mistakes in her claims. (See Exh. 69, Release from Verbal Warning dated April 6, 2010 at FIE 00631), showing Reichardt was released from verbal warning for having an untimely DOI status letter on April 6, 2011; while FIE 00632 shows that she was put back on verbal warning the exact same day for neglecting required tasks on dozens of claims. (See Exh. 70, Verbal Counseling-Performance, FIE 00632.)

63. Indeed, on April 6, 2011, Farmers issued Reichardt a Verbal Counseling-Performance. (App. Ex. 9,Reichardt Dep. Tr. 132:20-22; App. Ex. 47, 4/6/11 Memo to D. Reichardt re Verbal Counseling– Performance.) That letter set forth several areas where Reichardt's performance was "unacceptable" and cautioned that failure to correct her performance could lead to her termination. The Verbal Warning ran for 60 days, or until June 1, 2011. (Id.)

64. The decision to issue the Verbal Counseling was made by Reichardt's supervisor Lewis, his manager Duffy and Harmon, after consulting with Moravitz of Farmers' Human Resources. (App. Ex. 87, 4/6/11 Email from J. Lewis to J. Moravitz, J. Harmon, and M. Duffy.) Lewis was 51 years old at the time. (App. Ex. 13, Lewis Dep. Tr. 10:21-22.) Reichardt was 46 years old at the time. (Complaint ¶ 63.)

65. Prior to issuing the Verbal Counseling, Lewis had sent several emails to Reichardt addressing performance issues identified in the Verbal Counseling. (App. Ex. 27, 12/5/10 Email from J. Lewis to D. Reichardt; App. Ex. 28, 12/6/10 Email from J. Lewis to joe.lewis@21st.com; App. Ex. 17, 12/8/10 Email from D. Reichardt to J. Lewis; App. Ex. 18 12/19/10 Email from J. Lewis to joe.lewis@21st.com; App. Ex. 19, 12/19/10 Email from J. Lewis to D. Reichardt; App. Ex. 20, 12/19/10 Email from J. Lewis to D. Reichardt; App. Ex. 21, 12/23/10 Email from J. Lewis to joe.lewis@21st.com; App. Ex. 22, 12/23/10 Email from D. Reichardt to J. Lewis; App. Ex. 25, 9/30/11 Email from M. Duffy to D. Reichardt; App. Ex. 27, 12/5/10 Email from J. Lewis to D. Reichardt; App. Ex. 28, 12/6/10 Email from J. Lewis to joe.lewis@21st.com; App. Ex. 17, 12/8/10 Email from D. Reichardt to J. Lewis; App. Ex. 18, 12/19/10 Email from J. Lewis to joe.lewis@21st.com; App. Ex. 19, 12/19/10 Email from J. Lewis to D. Reichardt; App. Ex. 20, 12/19/10 Email from J. Lewis to D. Reichardt; App. Ex. 21,

12/23/10 Email from J. Lewis to joe.lewis@21st.com; App. Ex. 22, 12/23/10 Email from D.

Reichardt to J. Lewis; App. Ex. 48, 3/2/11 Email from M. Duffy to D. Reichardt.)

66. On May 11, 2011, Duffy directed Lewis to "spot check" Reichardt's files. (See Exh.

K, Duffy Dep. at 82:4-19.) (See also Exh. 71, Duffy email to Lewis dated May 11, 2011, FIE

21768-21773.) Duffy suggested Lewis "spot-check" Reichardt's files because dozens of her

claims had shown up on a list of claims missing Medicare information, as contrasted with all of

the other claims representatives on the list, who had only a handful of claims show up. (Pl. App.

Ex. 71, Duffy email to Lewis dated May 11, 2011, FIE21768-21773 at 21770-21773.)

67. On June 8, 2011, Reichardt was removed from the formal Verbal Warning. (App. Ex.

49, 6/8/11 Memo to D. Reichardt re Release from Verbal Warning – Performance.) However, the

Memo also cautioned Reichardt that if she "did not maintain satisfactory performance in the

future, [she] may be subject to further disciplinary action, up to and including termination." The

Memo was signed by Reichardt and Lewis.

68. After being removed from Corrective Action on June 8, 2011, Farmers then

placed Reichardt on Corrective Action yet again (Oral Warning) on November 10, 2011 for

"unsatisfactory performance." (See Exh. 72, Corrective Action Memo dated November 10,

2011from Lewis to Reichardt, FIE 00312.)

69. Reichardt's unsatisfactory performance included failing to timely send out

Pennsylvania status letters, failing to consistently follow Farmers Liability Strategy, failing to

submit accurate Pure Exposure Values, failing to negotiate within the established range of

values, failing to properly execute releases, failing to properly label, failing to accurately

document Medicare investigations, failing to utilize XM evaluation and failing to confirm if

medical expenses are truly out-of-pocket. (Id.)

70. The decision to issue the Oral Warning was made by Lewis, Duffy and Harmon, with input from Bode, based upon review of Reichardt's files. (App. Ex. 50, 10/5/11 Email from J. Lewis to M. Duffy.) The Warning period ran for 60 days, until January 10, 2012. (App. Ex. 51, 11/10/11 Memo to D. Reichardt re Oral Warning – Performance.) The Oral Warning stated that "[i]f during your Oral Warning period, or thereafter, you fail to meet the performance standards outlined above, you may be subject to further corrective action up to and including the termination of your reemployment." Reichardt refused to sign the Oral Warning Memo.

71. Reichardt admitted that she had not been keeping up with her workload during the period leading up to the November 10, 2011 Corrective Action. (Pl. App. Ex. A, Reichardt Dep. Tr. 163:8-164:4 ("With the workload, it's impossible to get things done. And the new claims coming in is – it's really hard to handle some of them.").)

72. While the November 10, 2011 Corrective Action noted examples of mistakes that were made on some files Reichardt handled, Reichardt also received a high Total File Quality score of 92.3%. (See also Exh. 10, Reichardt 2012 Mid-Year Review (showing her Total File Quality score was 95.5%)); (Exh. 99, Reichardt Declaration at ¶ 22.)

73.  Reichardt testified that after she was placed back on Corrective Action, at every meeting she had with her supervisor, Lewis, he only gave her negative feedback. (See Exh. A, Reichardt Dep. 161:22-162:10.) (See also Exh. 99, Reichardt Declaration at ¶ 20.)

74. Lewis also offered to sit with Reichardt during the Corrective Action process in an effort to improve her timeliness and quality. (Reichardt App. Exh 45. Email of J. Lewis.)

75. On January 12, 2012, Reichardt's November 10, 2011 Oral Warning was escalated to a Written Warning. (App. Ex. 9, Reichardt Dep. Tr. 173:21-25; App. Ex. 53, 1/12/1[2] Memo to D. Reichardt re Written Warning – Performance.)

76.  On January 16, 2012, Harmon asked Lewis to investigate more broadly whether Reichardt had been neglecting her files. (App. Ex. 54, 1/16/12 Email from J. Lewis to J.Harmon.) As a result of the investigation, Lewis issued Reichardt a Probation/Final Warning and reported to Harmon that after reviewing Reichardt's pending files, he discovered that she had as many as 33 claims with incomplete initial investigations and delayed file handling, and another six files with no activity for over two weeks. (App. Ex. 55, 1/24/12 Memo to D. Reichardt re Probation/Final Warning - Probation.)

77. Lewis also advised Harmon that Reichardt had made a notation in one of those files stating that she had left a message for a claimant. However, the file also contained a notation from a claims representative that had worked the file previously, which stated the number Reichardt allegedly left was disconnected. When Lewis called the number, he confirmed that it was not a working number. (App. Ex. 56, 1/18/12 Notes of J. Lewis; App. Ex. 57, 1/17/12 Email from J. Lewis to M. Duffy; App. Ex. 58, 1/17/12 Email from J. Harmon to J. Lewis.)

78. On January 20, 2012, Lewis received a complaint from a claimant's attorney stating that he had left Reichardt several messages but she had not returned his calls. (App. Ex. 59, 1/20/12 Email from D. Reichardt to J. Lewis.)

79. Although the Written Warning was set to extend for thirty days, through February 12, 2012, instead, after only twelve days, on January 24, 2012, Farmers placed Reichardt on "Final Warning-Probation." (See Exh. 74, Reichardt Probation/Final Warning-Performance, FIE 00309-00311.) The decision to issue the Final Warning was made by Lewis, Duffy and Harmon, with input from Bode, and based upon review of Reichardt's files.(App. Ex. 60, 1/11/12 Email from J. Lewis to J. Bode, J. Harmon, and M. Duffy.) The Probation period was for 30 days, until February 24, 2012, and advised that failure to improve her performance

21

could result in further corrective action. (App. Ex. 9, Reichardt Dep. Tr. 194:7-13; App.Ex. 55, 1/24/12 Memo to D. Reichardt re Probation/Final Warning - Probation.)

80. On January 26, 2012, Reichardt sent Lewis an email stating that she was electing to have carpal tunnel surgery, and would let him know when she had further details about how much time off she would need. (App. Ex. 52, 1/26/12 Email from J. Lewis to D. Reichardt.) The following day, Reichardt e-mailed Lewis to say that her surgery was scheduled for the following Wednesday, February 1, and that she would be taking vacation on Monday. January 30, and Tuesday, January 31, 2012. (App. Ex. 63, 1/27/12 Email from J. Lewis to D.Reichardt.)

81. Reichardt attached to her email a note from her orthopedist, Dr. Dethoff, stating that she had surgery scheduled for severe carpal tunnel syndrome. (See Exh. 76, Dr. Dethoff s note dated January 25, 2012, FIE 00469.) (See also Exh. 99, Reichardt Declaration at ¶ 29.)

82. Reichardt testified that that she sought to take disability leave at the end of January 2012 at least in part to get out of the office so that Lewis would be unable to "downgrade" her performance. (Pl. App. Ex. A, Reichardt Dep. Tr. 200:24-204:19.)

83. On January 30, 2012, Bode recorded a telephone conference as follows: "Spoke to Julie [Harmon], Mary Ellen [Duffy] and Joe [Lewis] 1/30/2012 ... Management would like to term since Debbie [Reichardt] is not participating in the Corrective Action process." (See Exh. B, Bode Dep. at 182:3-14.) (See also Exh. 77, Bode Notes at FIE 022825 "Debbie did not request the PTO time….this is against protocol." (Pl. App. Ex. 77, Bode Notes, FIE 022822-022824 at 022825.) Reichardt "never indicated that she needed surgery and did not request accommodation during any prior conversations." (Id.)

84. In addition, Reichardt's abrupt request for leave came within days after Lewis had discovered that she had made an entry in one of her files stating that she had left the message for

a claimant to a non-working number, which he, Harmon, and Duffy viewed as dishonest. (Reichardt App. Ex. 60, Email from J. Lewis to J. Bode dated January 11, 2012, FIE 09109-09112.)

85. Bode testified that she sought to manage the risk associated with terminating an employee who had requested leave because, "even when you do everything right, you can find yourself in litigation." (Pl. App. Ex. B, Bode Dep. Tr. 184:22-25.)

86. On January 31, 2012, Reichardt applied for medical leave of absence under the FMLA, and short-term disability benefits ("STD"), both commencing January 28, 2012. (App. Ex. 72, 2/1/12 Letter to D. Reichardt from Liberty Mutual.)

87. Reichardt didn't actually have surgery until February 14, 2012, and her doctor advised Farmers it was not medically necessary for her to be on leave before then. (App. Ex. 71, 2/21/12 Email from J. Harmon to J. Bode.)

88. The leave administrator subsequently notified Reichardt and Farmers that Reichardt's time off between January 28 and February 13, 2012 was not covered by FMLA. (Id.) Reichardt retroactively covered her absences for these two weeks with vacation.

89. Reichert returned to work July 9, 2012. (App. Ex. 76, 7/9/12 Email from J. Lewis to M. Duffy.) Lewis met with Reichardt upon her return and reissued the Probation Warning Memo. However, the Memo was updated to address concerns Farmers had about Reichardt not obtaining management approval prior to being out of the office from January 28, 2012 until February 13, 2012 and for leaving an incorrect phone number for Lewis on her voicemail (App. Ex. 9, Reichardt Dep. Tr. 220:18-20; App. Ex. 77, 7/9/12 Memo to D. Reichardt re Probation/Final Warning - Performance.) Reichardt refused to sign the Memo because she did not agree with it. (App. Ex. P. Reichardt Dep. Tr. 174.)

90. Upon returning to work, Reichardt was also informed that she was being placed into a new position as a direct claim representative, dealing directly with claimants, whereas previously she had been handling attorney-represented claims. (See Exh. A, Reichardt Dep. at 37:14-23; 39:5-8; 214:25-215:5. See also Exh. K, Duffy Dep. at 157:10-24.)

91. Also on July 9, 2012, Duffy emailed Lewis telling him to "[m]ake sure you are carefully looking at her work product." (See Exh. K, Duffy Dep. at 155:15-156:13.)

92: On July 25, 2012 Reichardt again met all the objective criteria in her 2012 Mid-Year Assessment regarding the handling of her files. (See Exh. 10.)  The results, however, were based on only two (2) claims. (Id.)

93. On August 16, 2012, Lewis received the following voicemail message from a customer:

> Ah, yes, Mr. Lewis, my name is Cecilia [M. (full last name stated on voicemail but shortened here in deference to the privacy interests of this claimant)]. I'm calling in reference to claim 1021813341. It was being handled by Debbie Reichardt who contacted me several times and she talked about, you know, my claim for, I guess, pain and suffering you'd call it. I was injured in car accident that happened on the 16th of July, however, ***I don't really want to deal with her***. She—the last I talked with her was last week. ***She was supposed to meet me, she set up a meeting, she didn't show up and then she called me after I called her a dozen times saying that she had left a voice mail at a number which clearly was***
> ***not mine***. So, you know, I feel like I'm getting the run-around from her and I would really appreciate it if you could handle this going forward and if you could call me back so we could get some resolution to this. I would really appreciate it. Thank you. My number is 267-394-[(last four digits provided in voicemail but redacted here in deference to the privacy interests of this claimant)].

(App. Ex. 79, voicemail from Cecilia M. produced in native (emphasis added).)

94. Later that day, Lewis, Duffy and Harmon recommended to Bode that Farmers terminate Reichardt's employment. (App. Ex. 80, 8/16/12 Email from J. Lewis to J. Bode.) Human Resources approved the termination on August 23, 2012, and Reichardt was notified of

her termination on the same day. (App. Ex. 81, 8/23/12 Email from J. Bode to J. Lewis; App. Ex. 82, 8/23/12 Email from J. Bode to J. Lewis.)

**Plaintiff Antonia Maiorini**

95. Plaintiff Antonia Maiorini ("Maiorini"), who was 67 years old at the time of her termination by Farmers, had begun her career in the insurance industry in 1987 with a company known as Colonial Penn, became a claims adjuster there in 1988, and remained continuously employed in that position for the next 25 years as her company went through a series of corporate mergers and acquisitions - the final one of which was the acquisition by Farmers of her then employer, AIG, in or around 2009. (See Exh. F, Maiorini Dep. at 15:21-24; 17:5-14; 20:20-22; 22:17-19; 28:13-15; 41:15-17.) (See also Exh. 100, Declaration of Antonia Maiorini at ¶ 2.)

96. Over the course of her 25-year career in the insurance industry as a claims adjuster, Maiorini handled a wide variety of insurance claims, including property and auto, and both litigation claims and direct claims. (See Exh. F, Maiorini Dep. at 15:20-16:17; 19:12-15; 20:2-16; 21:23-22:7) (See also Exh. 100, Maiorini Declaration at ¶ 3.)

97.  Maiorini was licensed in Connecticut, Delaware, and New Hampshire and had also attained a Chartered Property Casualty Underwriter ("CPCU") designation, considered a Master's Degree in insurance. (See Exh. F, Maiorini Dep. at 12:3-5.) (See also Exh. 14, FIE 00187. See also Exh. 100, Maiorini Declaration at ¶ 4.)

98. Two of Maiorini's former supervisors and co-workers, Jennifer Quinn ("Quinn") and Maryann O'Kane ("O'Kane"), (see Exh. G, Quinn Dep. at 18:9-21); (see also Exh. H, O'Kane Dep. at 10:7- 12, described her as an "above-average," "dedicated," "reliable," and "competent" employee "who possessed skill, experience and a work ethic that were equal to if not superior to

most if not all of our substantially younger peers.") (See Exh. 11, Declaration of Jennifer Quinn at ¶ 4.) (See also Exh. 12, Declaration of Maryann O'Kane at ¶ 6.)

99. Both Quinn and O'Kane admitted that they had not supervised Maiorini for at least 10 years (20 years for O'Kane) (Pl. App Ex. G., Quinn Dep. Tr. 17:18-21:14; Pl. App Ex. H, O'Kane Dep. Tr. 10:7-11:10); and both admitted that they had not audited Maiorini's files since the early 1990s nor had personal knowledge of the quality of her work. (Pl. App Ex. G, Quinn Dep. Tr. 20:15-22; Pl. App Ex. H, O'Kane Dep. Tr. 11:19-25.).

100. One of Maiorini's former supervisors, Linda Holwood ("Holwood"), testified that in 2006, while both women were employed at AIG, Holwood requested permission to terminate Maiorini's employment. (Pl. App Ex. I, Holwood Dep. Tr. 55:9-58:2.) AIG's Human Resource department declined Holwood's request due to concern that Maiorini might bring a claim for age discrimination. (Id. at 57:1-58:2.)

101. Instead, AIG Human Resources decided to reduce Maiorini's pending case load to half of what all the other claims representatives handled. (Id.)  Following the merger of AIG and Farmers in 2009-2010, Maiorini was gradually transitioned to Farmer's system, and expected to handle the same number of files as her peers.

102.  In 2011 and 2012, Maiorini reported to Supervisor Lewis. Lewis reported to Liability Claims Manager Duffy. Duffy reported to Pennsylvania State Manager, Harmon. (App. Ex. 81, Duffy Dep. Tr., 29:1-3.)

103. On May 15, 2012, Farmers placed Maiorini on a 60-day, Oral Corrective Action Warning for poor performance. (App. Ex. 1, Maiorini Dep. Tr. 176:10-12; App. Ex. 44, 5/15/12 Memo to A. Maiorini re Oral Warning - Performance.) The decision to issue that Oral Corrective

Action was made by Lewis, Duffy, and Harmon after consulting with Human Resources

Consultant Bode. (Id.) The Oral Warning sets forth several areas where

Lewis, Duffy and Harmon believed that Maiorini's performance was unacceptable, including, 1)

failing to make 24 hour contact attempts with all parties involved in an accident; 2) failing to

send a closing letter to the insured when the final injury claim is settled and closed; 3) failing to

send a settlement letter to all third party claimants advising them that a settlement check was sent

to their Attorney; 4) failing to engage in aggressive claims handling; 5) failing to make timely

responses to all direction given by management in claim files and emails; 6) failing to handle

coverage units quickly and thoroughly; 7) needing to achieve Early Contact Settlement goal of

35%; 8) failing to pay attention to detail; 9) failing to issue settlement checks within 3 calendar

days; 10) failing to send out timely Pa status letters and 11) failing to independently verify an

insured's vehicle identification number. (Id.)

     104.  In the 12 months prior to issuing the Oral Warning, Lewis had sent Maiorini several

emails about the performance issues addressed in the Oral Corrective Action. (App. Ex. 10,

5/31/11 Email from J. Lewis to A. Maiorini; App. Ex. 7, 5/26/11 Email from J. Lewis to A.

Maiorini; App. Ex. 8, 7/26/11 Email from J. Lewis to A. Maiorini; App. Ex. 9, 7/28/11 Email

from J. Lewis to A. Maiorini.)

     105. In the 12 months prior to issuing that Oral Warning, Lewis also met with Maiorini

on several occasions to explain some of these issues and how she could improve her

performance. (App. Ex. 11, 5/2/11 Email from J. Lewis to A. Maiorini; App. Ex. 12, 5/5/11

Email from M. Duffy to J. Lewis; App. Ex. 13, 5/19/11 Email from J. Lewis to M. Duffy; App.

Ex. 26, 3/12/12 Email from J. Lewis to A. Maiorini; App. Ex. 27, 1/31/12 Email from J. Lewis to

A. Maiorini; App. Ex. 28, 5/1/12 Email from K. Traugh to A. Maiorini; App. Ex. 29, 4/9/12

Email from J. Lewis to A. Maiorini; App. Ex. 14, 5/12/11 Email from M. Young to J. Lewis;

App. Ex. 30, 3/19/12 Email from J. Lewis to A. Maiorini; App. Ex. 31, 3/20/12 Email from J.

Lewis to A. Maiorini; App. Ex. 39, 4/13/12 Email from J. Lewis to A. Maiorini; App. Ex. 40,

4/9/12 Email from J. Lewis to J. Harmon; App. Ex. 41, 5/9/12 Email from J. Lewis to A.

Maiorini; App. Ex. 42, 5/29/12 Email from J. Lewis to A. Maiorini.)

106. In the 12 months prior to issuing the Oral Warning, deficiencies in Maiorini's

files were noted in official audits by Farmers' compliance group. (App. Ex. 32, 1/4/12 Email

from J. Lewis to A. Maiorini; App. Ex. 17, 1/19/12 Email from J. Lewis to A. Maiorini; App. Ex.

33, 5/2/12 Email from M. Duffy to J. Lewis; App. Ex. 34, 5/2/12 Email from M. Duffy to J.

Lewis; App. Ex. 35, 4/25/12 Email from M. Duffy to J. Lewis; App. Ex. 36, 5/17/12 Email

fromJ. Lewis to M. Duffy; App. Ex. 37, 1/12/12 Email from J. Lewis to A. Maiorini; App. Ex.

38, 3/1/12 Email from M. Duffy to J. Lewis.)

107. During the 60-day Warning period, Lewis e-mailed Maiorini about additional

performance issues. (App. Ex. 49, 6/2/12 Email from J. Lewis to A. Maiorini; App. Ex. 50,

6/4/12 Email from M. Duffy to J. Lewis; App. Ex. 51, 6/7/12 Email from V. Hawkins to A.

Maiorini; App. Ex. 45, 5/25/12 Email from J. Lewis to J. Harmon; App. Ex. 46, 5/20/12 Email

from M. Duffy to J. Lewis; App. Ex.47, 5/31/12 Email from J. Lewis to A. Maiorini.)

108. Specifically, on May 24, 2012, Lewis was reviewing a file that Maiorini was seeking

approval to settle and close. (Maiorini App. Ex. 45, Email from J. Lewis to J. Harmon dated May

25, 2012, FIE 15321-15324.) During his review, he observed that the format of Maiorini's

CLEAN form ["Coverage, Liability, Evaluation/Injuries, Action to Resolution, Negotiations."],

which must be completed by the adjustor within 10 days of a claim being reported, looked

different. (Id.) Upon investigation, he realized that Maiorini had accessed the PIP

representative's file and simply cut and pasted that representative's CLEAN, which utilized different formatting, into Maiorini's own file. (Id.) Maiorini had never contacted the insured, nor conducted any independent evaluation of the claim. (Id.) This discovery by Lewis, among other things, formed the basis for Lewis's request to escalate Maiorini's Corrective Action before the end of the oral warning period, "due to the serious potential business implications of her actions." (Pl. App. Ex. 83, Bode/Lewis Email Chain, FIE 15329-15331 at FIE 15329.)

109. On May 25, 2012, Lewis requested to escalate Maiorini's discipline from an oral to a written warning despite the fact that the Oral Warning had not expired  (See Exh. 83, Lewis email to Bode, FIE 15329-15331.) (See also Exh. 82, Maiorini Oral Warning, (stating that the warning will extend through June 24, 2012).)

110. Bode recommended not escalating Maiorini's Corrective Action, and instead giving her another chance to correct the performance deficiencies she had continued to exhibit even during the Corrective Action period. (Pl. App. Ex. 83, Bode/Lewis Email Chain, FIE 15329-15331 at FIE 15329.)("I am concerned that continually escalating the process may give the impression that we are not adequately allowing the Corrective Action process to work.") (See Exh. 83 at FIE15329.)

111. Bode also stated that she was "concerned because I have received this request from the [Pennsylvania] team a number of times over the last year." (See Exh. 83 at FIE 15329.) (See also Exh. B, Bode Dep. at 166:17-21.)

112. On June 19, 2012, Farmers issued Maiorini a 30-day Written Warning Letter. (App. Ex. 1, Maiorini Dep. Tr. 186:22 – 187:23; App. Ex. 52, 6/19/12 Memo to A. Maiorini re Written Warning - Performance.) The decision to issue a written warning was made by Lewis

and Duffy, in consultation with Bode. (App. Ex. 82, June 6, 2012 Email from J. Bode to J. Lewis

and J. Bode.) Maiorini refused to sign the Written Warning Letter.

113. On August 2, 2012, Farmers extended the June 19 Written Warning for 30

additional days (App. Ex. 1, Maiorini Dep. Tr. 213:17-21; App. Ex. 53, 8/2/12 Memo to A.

Maiorini re Written Warning - Performance.) Maiorini refused to sign the extension.

114. On August 2, 2012 Lewis told Maiorini, "You've made all the goals for this month

and usually at this point we would be taking you off warning. However, we've decided - he

didn't say who the 'we' was - that you should stay on the warning for another thirty days just to

make sure that you can maintain the level that you have reached."

(See Exh. F, Maiorini Dep. at 213:20-214:16.)

115. Farmers asserts that it did not take Maiorini off Corrective Action because, during

the 30-day Warning period, Lewis observed repeated instances of Maiorini simply failing to

work her assigned claims in a timely and appropriate manner, comply with Farmers' Liability

Strategy, or the Pennsylvania Fair Claims Practices Act. (Maiorini App. Ex. 49, Email from J.

Lewis to A. Maiorini dated June 2, 2012, FIE 15436; Maiorini App. Ex. 50, Email from M.Duffy

to J. Lewis dated June 4, 2012, FIE 15445; Maiorini App. Ex. 51, Email from V. Hawkins to A.

Maiorini dated June 7, 2012, FIE 15479.)

116.  On September 4, 2012, Farmers escalated Maiorini to a 30-day Probation/Final

Warning (App. Ex. 1, Maiorini Dep. Tr. 218:17-22; App. Ex. 54, 9/4/12 Memo to A. Maiorini re

Probation/Final Warning - Performance.) Maiorini signed the Probation/Final Warning, but

claimed it was not representative of her work.

117. In criticizing plaintiff Maiorini for having only one injury settlement in the last

two months, the September 4, 2012 Final Warning ignored the fact that Maiorini had been given predominately "coverage issues" instead of bodily injury claims, meaning that she was not in a position to settle bodily injury claims. (See Exh. F, Maiorini Dep. at 136:10-13; 237:17-22. (See also Exh. 100, Maiorini Declaration at ¶ 8.)

118. Lewis had also taken credit away from Maiorini for four bodily injury claims she had successfully settled for the stated reason that the claimants lived in Delaware, despite plaintiff Maiorini having a Delaware license. (See Exh. F, Maiorini Dep. at 296:7-297:6.)

119. At or around this same time, Lewis told plaintiff Maiorini, "You have to be perfect because you're on written warning and everything you do is being looked at completely and you have to be absolutely perfect." (See Exh. F, Maiorini Dep. at 166:22-167:6.) (See also Exh. 100, Maiorini Declaration at ¶ 17.)

120. In an email sent to HR representative Bode, Lewis reiterated the imposed requirement that plaintiff Maiorini should be "perfect. (See Exh. 49, Lewis email to Bode dated October 3, 2012, FIE 16454.)

121. On October 9, 2012, Farmers extended the Probation/Final Warning another 30 days (App. Ex. 1,Maiorini Dep. Tr. 228:1-7; App. Ex. 55, 10/9/12 Memo to A. Maiorini re Probation/Final Warning Extension - Performance.) Maiorini refused to sign the Extension.

122. Each of these letters explains that Maiorini's performance in the same basic areas continued to suffer with little or no improvement. (App. Ex. 53, 8/2/12 Memo to A. Maiorini re Written Warning – Performance; App. Ex. 54, 9/4/12 Memo to A. Maiorini re Probation/Final Warning – Performance; App. Ex. 55, 10/9/12 Memo to A. Maiorini re Probation/Final Warning Extension - Performance.)

123. During the period between June 19 and November 9, 2012, Lewis sent several

emails to Maiorini addressing the performance issues raised in the Warning Letters. (App. Ex. 49, 6/2/12 Email from J. Lewis to A. Maiorini; App. Ex. 67, 9/18/12 Email from V. Seguro to J. Lewis; App. Ex. 66, 10/12/12 Email from J. Lewis to A. Maiorini; App. Ex. 67, 10/28/12 Email from J. Lewis and A. Maiorini (noting Medicare issue in October 2012); App. Ex. 68, 11/7/12 Email from J. Lewis to A. Maiorini (noting Medicare issue in November 2012).)

124. During this time period, Lewis received messages from claimants and other carriers that Maiorini either was not returning their phone calls or her voicemail was full and they were unable to leave messages for her. (App. Ex. 70, 6/1/12 Email from J. Lewis to joe.lewis@hpcs.com; App. Ex. 71, 10/22/12 Email from J. Lewis to A. Maiorini; App. Ex. 72, 10/28/12 Email from J. Lewis and A. Maiorini; App. Ex. 73, 11/5/12 Email from J. Lewis to A. Maiorini.)

125.  Maiorini also sent several emails to Lewis acknowledging that she was not meeting the Company's goals to conduct face-to-face meetings with claimants or close files within 90 days of receipt. (App. Ex. 57, 7/16/12 Email from A. Maiorini to G. Chan and J. Lewis; App. Ex. 58, 7/27/12 Email from A. Maiorini to G. Chan and J. Lewis; App. Ex. 59, 8/3/12 Email from A. Maiorini to G. Chan and J. Lewis; App. Ex. 60, 8/10/12 Email from A. Maiorini to G. Chan and J. Lewis; App. Ex. 61, 10/4/12 Email from A. Maiorini to G. Chan and J. Lewis; App. Ex. 62, 10/19/12 Email from A. Maiorini to G. Chan and J. Lewis; App. Ex. 63.)

126. In November 2012, Lewis with additional approval from Harmon recommended to Bode that Maiorini's employment should be terminated. (App. Ex. 74, Memo from J. Lewis to J. Bode re Request for HR Consult on Involuntary Termination.)

127. Bode then presented their request to the Human Resources Roundtable, which is comprised of senior HR managers who advise the business on sensitive terminations or other

personnel issues. (App. Ex. 75, 10/2/12 Email from J. Bode to J. Lewis; App. Ex. 83, Bode. Dep. Tr. 156:24-157:5.)

128. The Human Resources Roundtable approved Lewis and Harmon's request to terminate Maiorini. (App. Ex. 76, 11/8/12 Email from J. Bode to J. Harmon.) Maiorini's employment was terminated on November 9, 2012. (App. Ex. 77, 11/9/12 Email from J. Lewis to J. Harmon.) At the time of her termination, Maiorini was 67 years old. (Complaint ¶ 16.)

129. Between 2010 and 2012, Farmers' practice was that an employee could not receive an overall rating of "Fully Meets" or "Exceeds Expectations" if s/he received a "Partially Meets" or "Below Expectation" rating in any individual category. Therefore, an employee could only receive an overall rating of "Fully Meets Expectation" if s/he was rated Fully Meets in all categories. Harmon and Lewis referred to this policy as the "all means all" policy," i.e. that if an adjuster received any rating below a Meets Expectation in any rating category, then the overall rating given to the employee would have to be lower than a "Meets." (See Exh. C, Harmon Dep. at 265:8-12. See also Exh. J, Lewis Dep. at 60:2-19.)

130. In 2010, Farmers made a decision that every employee rated at least "Fully Meets Objectives" in the "Behaviors" category would receive an overall rating of "Fully Meets," even if they received a rating of "Partially Meets" or "Below Expectation" in one of the objective categories. The employees' overall ratings were "upgraded" so that they could participate in Farmers' bonus pool, which had excess funds to distribute that year. (Pl. App Ex. C, Harmon Dep. Tr. 157:16-158:10-13, 18; 265:8-266:9.) This exception was applied uniformly to all employees who satisfied the criteria, including workers over 40.

131. Farmers could not locate any documentation memorializing its decision in 2010 that every employee rated at least "Fully Meets Objectives" in the "Behaviors" category would

receive an overall rating of "Fully Meets," even if they received a rating of "Partially Meets" or "Below Expectation" in one of the objective categories. (Pl. App Ex. C, Harmon Dep. Tr. 157:16-158:10-13, 18; 265:8- 266:9.)

132. The four claims representatives in the King of Prussia office reporting to Mary Ellen Duffy and Diane Dimeo (the largest group) who were upgraded were: Nate McMillan (age 30); Ijnanya Newman (age 36); Karin Weaver (age 38); and Barbara Frey (age 52). (Pl. App. Ex. 36, McMillan's 2010 Year-End Assessment; Pl. App. Ex., 25, Newman's 2010 Year-End Assessment, Supp. App. Ex. 1, Weaver's 2010Year-End Assessment; Supp. App. Ex. 2, Frey's 2010 Year-End Assessment.)

133. Plaintiffs have not submitted any evidence that any representative over 40 who received a "Fully Meets Objectives" in the "Behaviors" category but was not upgraded. Nor have plaintiffs produced any evidence that any representative under 40 was upgraded even though s/he received a "Behaviors" rating of "Partially Meets" or "Below Expectation."

134. In 2012, one of the objective criteria included in individual annual reviews for claims representatives was an office-wide "Customer Experience" rating. That year, the King of Prussia office received a "Below Expectations" rating based on customer surveys. Farmers recognized that liability claims representatives in the King of Prussia office had no control over that rating; it reflected customer service exclusively for automotive property damage adjusters. Therefore, Farmers determined that the *office* rating for Customer Experience would not factor into the overall *individual* rating for any liability claims adjuster—including adjusters over 40. (Pl. App Ex. J, Lewis Dep. Tr. 105:18-107:20.)

135. Those adjusters reporting to Dimeo and Duffy who received a "Fully Meets" or better rating because the *only* rating they received below "Fully Meets" was "Customer

Experience" were: Kelly Gallagher (23); Candice Clare (30); Kathy Traugh (34); Capri Bonczek (38); Ijnanya Newman (38); Michelle Young (44) and Barbara Frey(54). (Pl. App. Ex. 27, Gallagher's 2012 Year-End Assessment; Pl. App. Ex. 37, Clare's 2012 Year-End Assessment; Pl. App. Ex. 32, Traugh's 2012 Year-End Assessment; Pl. App. Ex. 34,Bonczek's 2012 Year-End Assessment; Pl. App Ex. 30, Newman's 2012 Year-End Assessment; Supp. App. Ex. 3, Young's 2012 Year-End Assessment; and Supp. App. Ex. 4, Frey's 2012 Year-End Assessment.) Plaintiffs have not identified anyone over 40 who had the Customer Experience rating applied against their overall rating.

136. Thus, for example, Maiorini, in her **2010** Year-End Assessment, received four ratings of Exceeds in the objective categories and one rating of "Meets," in the subjective category of "Behaviors" and therefore her "overall rating" for the year was a only a "Meets." (See Exh. 18, Maiorini 2010 Year-End Assessment, FIE 00563-00569.)

137. During the first eight years of her employment with Farmers, Reichardt consistently received favorable performance reviews, with her scores ranging from "Meets Expectations" to "Exceeds Expectations" in every performance category in which she was rated. (See Exh. 2, Reichardt 2002-2007 Salary Reviews.) (See also Exh. 3, Reichardt 2003 Performance and Development Plan and Review; Exh. 4, Reichardt 2006 Performance and Development Plan and Review; Exh. 5, Reichardt 2009 Year-end Assessment; Exh. 6, Reichardt 2010 Mid-Year Review; Exh. 7, Reichardt 2010 Year-end Assessment; Exh. 8, Reichardt 2011 Mid-Year Review; Exh. 9, Reichardt 2011 Year-end Assessment; Exh. 10, Reichardt 2012 Mid-Year Review.) (See also Exh. 99, Reichardt Declaration at ¶ 5.)

138. Thus, for example, in her **2009** Year-End Performance Assessment, Reichardt received the following ratings in the four categories of her performance rated

annually by Farmers: "Exceeds Expectations" in Total File Quality; "Exceeds Expectations" in Evaluation Quality; "Exceeds Expectations" in Key Values Quality Objective; and "Meets Expectations" in Behavior. (See Exh. 5.) (See also Exh. D, Scheibner Dep. at 34:16-35:4.)

139. In her **2010** Year-End Assessment, Reichardt received three ratings of "Meets" and one rating of "Partially Meets " in the category of "Behaviors" and therefore her "overall rating" for the year was only a "Partially Meets." See (Exh. 7, Reichardt 2010 Year-End Assessment, FIE 00622-00628.) Reichardt's 2010 Year-End Assessment rated her as "Partially Meets Expectations" for "Behaviors" and "Fully Meets" for certain objective metrics included on the Annual Evaluation form for 2010.

140. In an email dated December 14, 2010, Harmon directed Lewis to rate Reichardt as "Partially Meets" for Behavior on her 2010 Year-End Assessment: "Joe - I put Debbie [Reichardt] in as a PM for both Behaviors and Support as your write up indicates that she is requiring a higher level of support than would be expected with her level of experience." (See Exh. 17, Harmon email to Lewis dated December 14, 2010, FIE 21961.) (See also Exh. C, Harmon Dep. at 258:2-18.) This was consistent with the purpose of the "Behaviors" category which was an evaluation of whether the representative required more or less support or supervision than someone of his/her experience should need.  (See, e.g., Pl. App Ex. J, Lewis Dep. Tr. 80: 13-82:4; 127:2-128:10.)

141. By contrast, Kajal Brazwell, 34 years of age, (see Exh. 19, Defendant Farmers First Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories and First Request for the Production of Documents) in her **2012** Year-End Assessment, received one rating of "Exceeds," in the category of "Behaviors," three ratings of "Meets," and one rating of "Does Not Meet Objective," (sometimes referred to as "Below Expectations") and nonetheless

her "overall rating" for that year was "Exceeds." (See Exh. 20, Brazwell 2012 Year-End Assessment, FIE 01772-01775.)

142. By contrast, in her **2012** Year-End Assessment, Gillian Bressi, 33 years of age, received one rating of "Exceeds" in the category of "Behaviors," three ratings of "Meets," and one rating of "Below Expectations;" yet her "overall rating" for the year was an "Exceeds." (See Exh. 21, Bressi 2012 Year-End Assessment, FIE 00756-00759.)

143. Allyson Hackett, 58 years of age, in her **2010** Year-End Assessment received two ratings of "Exceeds" and two ratings of "Meets," including one in the category of "Behaviors" and therefore her "overall rating" for 2010 was a "Meets." (See Exh. 22, Hackett 2010 Year-End Assessment, FIE 01919-01924.)

144. By contrast, Kathryn Traugh, 33 years of age, in her **2011** Year-End Assessment received one rating of "Exceeds"in the category of "Behaviors" and three ratings of "Meets" and therefore  her "overall rating" for that year was an "Exceeds." (See Exh. 23, Traugh 2011 Year-End Assessment, FIE 00838-00843.)

145. Darlene Barbee, 59 years of age, in her **2012** Year-End Assessment received three ratings of "Meets," one rating of "Partially Meets" in "Behaviors"and one rating of "Below Expectations," and therefore  her "overall rating" was "Partially Meets." (See Exh. 24, Barbee 2012 Year-End Assessment, FIE 01718-01721.)

146. Jennifer Quinn, 59 years of age in 2012, in her **2010** Year-End Assessment received two ratings of "Exceeds," one rating of "Meets," and one rating of "Partially Meets," in the category of "Behaviors" and her "overall rating" for that year was a "Partially Meets." (See Exh. 26, Quinn 2010 Year End Assessment, FIE 02144-02154  Because Quinn's "Behavior rating" did not meet expectations, consistent with Farmers' policy, her overall rating was also "Partially

Meets Expectations." Notably, Dimeo wrote in the "Behavior" section of the review that Quinn, "openly voiced disgruntled opinions and editorial comments [which] were discussed with [her] on multiple occasions throughout the year but [she] failed to improve." (Pl. App. Ex. 26, Quinn 2010 Year-End Assessment.) At her deposition, supervisor Linda Holwood described one of Quinn's outbursts: "She walked in the office, I'm going to be very bold here, she walked in the office and went 'Fuck you and fuck you. I don't have to put up with this. I wish I had a gun.' It was that loud and in that tone." (Pl. App Ex. I, Holwood Dep. Tr. 37:9-40:7.)

147. By contrast, Kelly Gallagher, 23 years of age, in her **2012** Year-End Assessment received only one rating of "Exceeds" in "Behaviors," three ratings of "Meets," and one rating of "Partially Meets," yet her "overall rating" for that year was an "Exceeds." (See Exh. 27, Gallagher 2012 Year-End Assessment, FIE 01908-01912.)

148. Gallagher also received a "Fully Meets Expectation" rating in all the remaining individual objective categories—many of which were simply pass/fail, and the highest rating available at the time was "Fully Meets." Finally, Gallagher received a "Does Not Meet" in the office-wide Customer Experience Rating, which Farmers had determined would not be factored for any Liability Claims Representative that year. (Pl. App. Ex. 27, Gallagher 2012 Year-End Assessment.) Gallagher's manager determined that her overall rating should be "Exceeds Expectations."

149. Allyson Hackett, age 58, received an overall score of "Partially Meets" on her 2011 Year-End Assessment despite having received a "Meets" in Total File Quality, a "Meets" in Evaluation, a "Partially Meets" in Behavior, and a "Meets" in Negotiation. (See Exh. 29, Hackett 2011 Year-End Assessment, FIE 01937-42). Hackett could not be rated "Meets" or higher overall in 2011 because she only received a "Partially Meets" in "Behaviors."

150. Upon receiving an overall score of "Partially Meets" on her 2010 Year-End

Assessment, Reichardt wrote, I do not agree at all with my overall rating being a partially meets.

How can I met [sic] 3 of the goals and exceed 1 of them and be rated a partially meets employee?

If they are calculated on a 25% rating then all should have evened everything out with the

exceeded goal and made me a meets. My performance level was strictly based upon Behaviors

and nothing else mattered. . ." (See Exh. 7 at FIE 00627.)

151. Supervisor Lewis responded to Reichardt's objection, stating that she was being

treated the same as everyone in the King of Prussia office:

> Q. And did you understand after reading her comments that she felt that she was being
> treated unfairly?
> A. I actually do remember speaking to Ms. Reichardt, after I started reading this and I got
> a little memory back. What I explained to Debbie was, in this evaluation, in the year-end
> evaluation, "all" means "all." So if you have four categories, you're an "Exceeds", a
> "Meets," a "Meets," and then you are a "Partially Meets," which means you don't meet,
> then you're going to be a "Partially Meets," and that's for everyone.
> Q. When you say that's for everyone, what do you mean?
> A. That's how the evaluation would be completed for everyone.
> Q. For everyone, for all the reps –
> A. Yes.
> Q. - In the King of Prussia office?
> A. Yes.

See Exh. J, Lewis Dep. at 59:23-60:19.

152. However, at his deposition, Lewis admitted that certain younger adjusters had not in

fact been held to the "all means all" policy:

> Q. Would you agree with me that "all" does not mean "all" for Ms. Newman [38 years
> old at the time]?
> A. Yes.

See Exh. J, Lewis Dep. at 90:9-14.

> Q. Would you agree with me that for Mr. McMillan [32 years old at the time] "all" does
> not mean "all" for his Year-End Assessment in 2010?
> A. Yes.

(Id. at 94:15-19.)

> Q. Would you agree with me that "all" does not mean "all" for Mr. McMillan for his mid-year 2010?
> A. Yes.

(Id. at 95:20-24.)

153. Harmon subsequently explained, based upon personal knowledge, that in 2010 employees' overall ratings were "upgraded" so that they could participate in Farmers' bonus pool, which had excess funds to distribute that year. (Pl. App Ex. C, Harmon Dep. Tr. 157:16-158:10-13, 18; 265:8-266:9.) This exception was applied uniformly to all employees who satisfied the criteria, including workers over 40. (See Response to Allegation 22, incorporated herein.

154. In Reichardt's 2011 Year-End Assessment, while her scores in the three objective categories in which she was rated - Total File Quality, Evaluation, and Negotiation - were "Meets," Farmers rated Reichardt as "Partially Meets" in Behavior, and then utilized that one lower rating to give her the lowered "overall score" of only "Partially Meets." (See Exh. 9, Reichardt 2011 Year-End Assessment.)

155. In her 2011 Year-End Assessment, Farmers downgraded Allyson Hackett, age 58, to only a "Partially Meets" in Behavior, and then, despite her being rated as a "Meets" in the three objective categories of Total File Quality, Evaluation, and Negotiation, utilized that one lower rating to give Hackett the lowered "overall score" of only "Partially Meets." (See Exh. 29, Hackett 2011 Year-End Assessment.)

156. Hackett's 2011 Year-End Assessment specifically notes that "[s]he has struggled with timely DOI letters and becoming familiar with the Farmers Liability Strategy." It further notes that the deficiencies in Hackett's behavior and level of support had been ongoing that year,

and she was "placed on an 'oral' improvement plan the second half of 2011[.]" (Pl. App. Ex. 29, Hackett 2011 Year-End Assessment.)

157. At her deposition, O'Kane, a former supervisor, explained her concern regarding Harmon's use the subjective rating of in the "Behavior" category to downgrade older employees as follows: All warnings bells went off for me because I had been a supervisor and those subjective terms of attitude, instead of, like, objective criteria that you could evaluate somebody on, that was a way - that was her [Harmon's] leverage point to elevate her people. (See Exh. H, O'Kane Dep. at 30: 2-11.)

158. O'Kane admitted that she had no personal knowledge of why other employees were criticized or disciplined for performance issues. (Pl. App Ex. H, O'Kane Dep. Tr. 12:19-14:12.)

159. On July 13, 2011, Harmon had Maiorini placed on Corrective Action for having one delayed DOI status letter. (See Exh. 42, Lewis email to Harmon, FIE 13341.) (See also Exh. 43, Maiorini Warning Letter, FIE 00570; Exh. F, Maiorini Dep. at 108:22-109:2.)

160. Farmers also placed Darlene Barbee, 59 years of age in 2012, on Corrective Action in January 2011 for having delayed DOI status letters. (See Exh. C, Harmon Dep. at 111:19-112:13.) (See also Exh. 44, Barbee Warning Letter, FIE 22054.)

161. Farmers also placed Allyson Hackett, 58 years of age in 2012, on Corrective Action on July 14, 2011 for having one untimely status letter. (See Exh. 45, Hackett Warning Letter, FIE 01925.)

162. Farmers also put Candice Clare (born 1982) on Corrective Action in 2011 for having at least one late DOI status letter (Supp. App. Ex. 7, Verbal Counselling Memo dated April 1, 2011, FIE 02540-02553 at 02540), and put Nate McMillan (born 1980) on Corrective Action in

2012 for having at least one late DOI status letter (Supp. App. Ex. 8, Written Warning Memos, FIE 02076-02086 at 02083.)

163. As noted above, Harmon claimed that it was Farmer's policy in 2011 to have zero tolerance in regard to late DOI letters because Farmers had failed the 2010 Market Conduct Examination. (See Exh. C, Harmon Dep. at 91:9-19; 92:16-20.) (See also Supp. App. Ex. 5 Report of Market Conduct Examination of Bristol West Insurance Company, FIE 22662-22727; Supp. App. Ex. 6, Commonwealth of Pennsylvania Insurance Department, Market Conduct Examination Report of 21st Century Indemnity Insurance Company, FIE 22728-22785.)

164. By 2012, Farmers was no longer responding to the adverse findings of the Pennsylvania Department of Insurance. As a result, Farmers stopped issuing warning letters for a single violation. Rather, Farmers viewed failures to send such letter as part of overall performance management, *i.e.,* was it indicative of a failure to proactively and properly manage files.

165. Harmon testified that the policy mandating that claims adjusters be put on Corrective Action because of untimely status letters changed at some point:

> Q. But at some point you're telling me that the policy changed, and it didn't matter if you had one or more DOI late status letters, you were not automatically going to be subject to corrective action, correct.
> A. It was stated that you would not - solely one, if somebody missed one down the road, in say, 2012, 2013, they may not have been put on corrective action solely for that.
> Q. How about if they missed two?
> A. If it was a trend, it would have been addressed. What that trend would be, if it continued, absolutely it should have been addressed by the supervisor.

(See Exh. C, Harmon Dep. at 92:21-93:10.)

166. In this regard, according to Farmers' 2012 audit report, Gillian Bressi, age 33, Kathryn Traugh, age 34, Zachary Baltz, age 30,, and Capri Bonczek, age 38,

had untimely DOI status letters in one (Baltz), (Bonczek) four (Bressi) and five (Traugh) of the claims they handled, but received neither Corrective Action nor performance management for 90 days as a result of these deficiencies. (See Exh. 46, Defendant Farmers Insurance Exchange's First Amended Responses to Plaintiff Maiorini's Second Set of Requests for Admissions, pp. 3-4.) (See also Exh. 40, 2012 Status Report, FIE 02444-02479.)

167. In 2012, no Farmers employee, including both Plaintiffs, received a verbal counseling memorandum related to the 2012 audit report (Pl. App. Ex. 40, 2012 Status Report, FIE 02444-02479) solely for having one or more untimely status letters as required by DOI regulations.

168. Despite Ms. Traugh, age 34, having five untimely status letters and Ms. Bressi, age 33, having four untimely status letters in 2012 alone, neither was put on Corrective Action, performance management, or even saw this issue mentioned in their 2012 Mid-Year or Year-End performance evaluations. Indeed, both of these younger claims adjusters received "Exceeds" as their overall scores in their 2012 Year-End performance evaluations. (See Exh. 47, Traugh 2012 Mid-Year Review, FIE 00844-00847, and Exh. 32, Traugh 2012 Year-End Assessment, FIE 00848-00852.) (See also Exh. 48, Bressi 2012 Mid-Year Review, FIE 00752-00755, and Exh. 21,2012 Bressi Year-End Assessment, FIE 00756-00759.)

169. Farmers admits that it has not formal documentation of the policy change.

170. Once an employee is put into the Corrective Action system, as explained by Lewis to Maiorini (whom he had placed on written warning after discussion with Harmon), "You have to be perfect because you're on written warning and everything you do is being looked at completely and you have to be absolutely perfect." (See Exh. F, Maiorini Dep. at 166:22-167:6.) (See also Exh. 100, Maiorini Declaration at ¶ 17.)

171. Closer scrutiny was applied to employees on Corrective Action, to ensure that they were making enough progress so that they could be removed from Corrective Action when the specified period ended. For example, Alayne Bleau was put on Corrective Action but then removed from it after she addressed her performance issues. (Supp. App. Ex. 9, Memo regarding Removal from Corrective Action, FIE 01728.) Similarly, Darlene Barbee was put on Corrective Action, but she improved her performance and was removed from. it. (Supp. App. Ex. 10, Memo regarding Release from Oral Warning-Performance, FIE 01716.)

172. Confirming the fact that, once employees are placed into Corrective Action, Farmers scrutinized their files more closely to find any errors, Human Resources Manager Bode admitted the following at her deposition: "Everybody is treated the same up to the point you are put on Corrective Action, at which point it would be my expectation that the leader would invest more time working with that individual and coaching them to improve their performance. That is what the process is designed for." (See Exh. B, Bode Dep. at 109:13-22.)

173. Lewis told Bode "With [Maiorini's] low inventory, her work product should be perfect." (See Exh. 49, Lewis email to Bode dated October 3, 2012, FIE 16454.)

174.  Harmon admitted that "it's pretty hard for a claim adjustor to do everything right on every file all the time." And "depending on how many files they have, and whether or not they, for instance get a bulk transfer of files, it can be difficult to meet all of those standards and objectives…" (See Exh. C, Harmon Dep. at 160:7-161:4. See also Exh. 99, Reichardt Declaration at ¶ 12.)

175. Thus, according to a memorandum distributed by supervisor Lewis to all his direct reports, with a copy to Liability Claims Manager Duffy, his review of the files of all the claims adjusters in his unit indicated a number of *common* problems that all the adjusters,

including both Reichardt and Maiorini were having with their files. (See Exh. 50, Lewis' 6/6/12 Agenda, PLS 000888-891.)

176.  In this memorandum, Lewis noted a number of common issues that the adjustors, including Reichardt and Maiorini, were having complying with Farmers' CLEAN requirements as follows:

☐ We are seeing many claims that have CLEANS that have been copied over and over in the files with information that is not correct;
☐ There are CLEANS that say the VIN will be confirmed when the police report comes in where the police report has been in six months and offers are made with coverage still indicating more is needed.
☐ We have seen claims that said VIN was confirmed by MD adjuster when we never even assigned the car out to be seen.
☐ We have seen liability screens that discuss waiting for the P/R, when it was received months before and the CR [claims representative] documented it in activity notes.
☐ I see file notes that indicate a need for increased reserves, or PEVs, and then a CLEAN is done showing the increase with no discussion as to why.
☐ Transfer files seem to have the most problems. Fundamental mistakes are being carried forward. If something was updated, missed or incorrect on the first go-round, it is frequently copied and never addressed. We looked at file with an ULD that has been through 3 people on 3 different teams and nobody caught that we never spoke to the NI to confirm perm use.

(See id.)

177. According to O'Kane, the more experienced former AIG employees such as O'Kane, Reichardt and Alison Terry were being assigned the more complex bulk AIG Legacy litigation files that were being run off after AIG became part of Farmers. O'Kane testified that she felt the experienced claims representatives were being "put in a position to fail" because "your pending caseload was 245 complex files." (Pl. App. Ex. H O'Kane Dep. at 32-37.) Quinn and O'Kane, adjusters in their sixties, averred that they had their files along with other older adjusters, including plaintiffs, picked apart and were disciplined for supposed attitude problems

while younger adjusters were not subject to the same level of inspection despite having myriad mistakes in their files. (See Exh. 11, Quinn Declaration at ¶¶ 9-10, 17.) (See also Exh. 12, O'Kane Declaration at ¶¶ 19-23.)

178. Both Quinn and O'Kane subsequently admitted at deposition they had no personal knowledge of any claims representative being subject to greater scrutiny. (Pl. App. Ex. G, Quinn Dep. Tr. 72:20-84:5; Pl. App. Ex. H, O'Kane Dep. Tr .12:19-15:21, 24:19-26:20.)

179. In fact, the only "nitpicking" that Quinn was able to identify at her deposition was a one-time criticism of Maiorini's clothing. (Pl. App. Ex. G, Quinn Dep. Tr. 101:7-102:24.)

180. Maiorini testified, "The older people all agreed that they were picking little tiny things out of everybody's file. Nobody's perfect, so you're always going to find those things. And when I talked to the younger people, they said they were feeling no such pressure." (Pl. App. Ex. F. Maiorini Dep. Tr. 156-157.)

181. Maiorini further testified that she did not have any personal knowledge, based on conversations with supervisors, of whether or not younger people had been reprimanded for the same mistakes and deficiencies for which she had been reprimanded. (Pl. App. Ex. F, Maiorini Dep. Tr. 159:6-160:4.).

182. Maiorini testified at her deposition as follows: [T]he older people's files were picked apart. They were looked at under a microscope. Every little thing that they found wrong was brought up and complained about, while young people did not have that same criteria placed on them. (See Exh. F, Maiorini Dep. at 91:6-12.) Maiorini also testified that she had spoken with older people in the office who believed that younger people in the office were not being reprimanded. (Mairoini Dep. at 159.)

183. Mairoini also admitted that she did not remember whether these older people had told her that they had spoken to supervisors of the younger people to verify whether or not the younger people had been reprimanded. (Id.) Maiorini also admitted that the older people had not looked through the files of the younger people to verify if there had been any reprimands and that she had not spoken with the supervisors of the younger people to confirm that they had been reprimanded (Id. at 159-160.)

184. Claims Representatives typically had more than one hundred open files making it easy to find mistakes in each adjuster's files to keep them on Corrective Action. (See Exh. 51, FIE 02278-85.)

185. An audit report from 2012 revealed that Gillian Bressi, 33 years old at the time, had nine claims with various mistakes, (see Exh. C, Harmon Dep. at 167:5-172:129); (yet no Corrective Action); Ijnanya Newman, 38 years old at the time, had twenty late files in August 2012,( see Exh. 52, Duffy letter to Lewis dated August 20, 2012 with attached late files, FIE 21830-21831) (yet no Corrective Action): "Kiki [Newman] (age 38) is starting to scare me. She has 20 over 15 days. Can you give me an update?" (yet no Corrective Action); and both Kaja Brazwell, 34 years old at the time, and Kelly Gallagher, 23 years old at the time, failed to meet Farmers' disposition objective from January through May 2012, (see Exh. B, Bode Dep. at 127:14-25; 132:15-133:19; see also Exh. 53, Bode Chart, at FIE 02340 and FIE 02343 (yet no Corrective Action.)); (Exh. 46, Defendant Farmers Insurance Exchange's First Amended Responses to Plaintiff Maiorini's Second Set of Requests for Admissions, pp. 9-15.)

186. As to Kajal Brazwell and Kelly Gallagher, as Bode testified at her deposition, she specifically looked into why neither  had not been subjected to corrective action for not meeting their disposition objectives during a certain period, and she learned from Harmonthat both were

brand new hires who had recently received bulk transfers. (Pl. App. Ex. B, Bode Dep. Tr. 127:14-129:21; 132:13-133:19.)

187. McMillan, born 1980 and 31years old at the time received an overall rating of "Partially Meets" for 2011 and, after being on Corrective Action during 2011, was terminated in 2012 for his failure to meet Farmers' performance expectations. (Supp. App. Ex. 11, McMillan 2011 Year-End Assessment, FIE 02087-02090.) Candice Clare, born 1982 and thus not even 29 years old in 2011, received five warning memoranda and was on Corrective Action for the majority of 2011. (Supp. App. Ex. 7, Verbal Counselling Memo dated April 1, 2011, FIE 02540-02553.)

188. O'Kane testified that "When [Harmon] was in the office, she would sail past us [the AIG legacy employees]—and we were segregated in a spot—sail past us, never acknowledging us. But she did acknowledge the other ones [the Farmers' employees]. Its almost like she viewed and communicated, don't mess with them, they're not worth it. Or one could deduce, they're not going to be here that long." (Pl. App. Ex. H, O'Kane Dep. Tr. 39.)

189. O'Kane also admitted that her complaint was with the way Harmon allegedly treated the AIG legacy employees, not how she treated "older" employees. (Pl. App. Ex. H, O'Kane Dep. Tr. 38:6-39:18.) She further admitted that she did not know if Harmon was dismissive or not respectful to people who had come up through the Farmers' system (as opposed to AIG) or whether Harmon was always nice to people who had come up through the Farmers' system. (Id. at 39:19-40:20.)

190. Russell testified that Harmon was friends with some of the younger Claims Representatives, including DiMeo, Bonzcek, Traugh and Bressi. Russell admitted that he was the one who coined the phrase "pajama party" to refer to Harmon and the younger female claims

representatives, and that his sole basis for characterizing them this way was that "they would, like, gather in the corner of the office. It was like a teenager sleepover, you know," and "whenever I visited that office or that there was a meeting or if we had a group meeting, whether it be, like, in the cafeteria or her office, you know, before everybody got started, it was just , , , the party got together." (Pl. App. Ex. E, Russell Dep. Tr. 34:14- 35:12.) Russell elaborated that "[i]t was just pretty obvious. Like I said, you know, it was just -- you know, they got together in and out of the office. I mean, obviously, you know, they were friends." (Id. at 36:7-15.)

191. Quinn averred that "The Claims Adjusters hired by Ms. Harmon were sent to California for three weeks of training at Farmers' expense, to learn the Farmers' software programs that we were required to use to document our work product. Older claims adjustors like Ms. Maiorini and Ms. Reichardt generally were not given this training but rather were expected to learn the program without any significant specialized training." (Pl. App. Ex. 11, Quinn Declaration at ¶ 8.)

192.  However Quinn later testified that she had no personal knowledge of what training was provided and that her averment was based only on comments she heard from co-workers. (Pl. App. Ex. G. , Quinn Dep. Tr. 58-59.)

193. Duffy criticized Lewis in an email on June 22, 2012, for writing a "glowing note" to Jennifer Bode in Human Resources about plaintiff Maiorini, in which he had indicated to Bode that Plaintiff Maiorini was "all in." (See Exh. K, Duffy Dep. at 211:16- 21.) (See also Exh. 81, Duffy email to Lewis dated June 22, 2012, FIE 10804.) Duffy stated in the email that feedback regarding an employee on action was to be conveyed to Human Resources at the end of the Corrective Action period, not incrementally in the middle of the period. (Pl. App. Ex. K, Duffy Dep. Tr. 211:22-212:11.) Duffy testified that she put Lewis on an action plan because of the way

he handled performance management generally, with respect to all employees. (Pl. App. Ex. K, Duffy Dep. Tr. 213:10-24.)

194. Maiorini testified that on three occasions, Lewis brought up the subject of her retirement. In each conversation, according to Maiorini, Lewis simply asked her generally about retirement or alluded to the concept of retirement. (Id. at 146:3-8 (alleging Lewis said, "You're lucky, I wish I could retire.").)

195.  Sheibner testified that he was told by Duffy at the directive of Harmon to place claims adjuster, Mary Ellen Whetts ("Whetts"), age 59 at the time, into Corrective Action, even though he did not agree with the decision. (See Exh. D, Scheibner Dep. at 72:5-73:15.)

196. Whetts was then given additional warnings on September 27, 2012 (FIE 02263-02264), October 26, 2012 (FIE 02265-02268), and November 28, 2012 (FIE 02269-02271) – all under the performance management system under the control of Harmon. (See Exh. 88, Whetts Warning Letters, FIE 02263-02271. See also Exh. L, Whetts Dep. at 48:5-13.)

197. Whett's employment with Farmers ended as a result of a 2013 "staff reduction." (Pl. app.Ex. L, Whetts Dep. Tr. 46:18-49:10.)

198. Harmon directed supervisor Christine DeWaghe ("DeWaghe") to give O'Kane (age 62 at the time) a verbal warning in 2010, based on Harmon's review of a single file. (See Exh. 12, O'Kane Declaration at IT 11-12.) (See also Exh. H, O'Kane Dep. at 45:1-8;46:14-16.)

199. O'Kane admitted , however, that she had not received a passing score on the audit of the file in question and that, to her knowledge, nothing was ever placed in her personnel file regarding the file, and that she never heard anything about that warning or that file again. (Pl. App. Ex. H, O'Kane Dep. Tr. 45:25-48:7.)

200. In addition, Harmon also provided direct input to both Bode and

Lewis in April 2012 in regard to the "performance management" of Barbee, specifically

directing Lewis to monitor and then discipline Barbee for not settling enough claims

in a timely manner, as evidenced in the following email chain:

[Harmon to Lewis]: "The other person who really concerns me on your team is
Darlene. Look at her closures (closed with amount on this report) - 35 settlements
in an entire year! Only 7 total in 2012." (See Exh. 90 at FIE 14145), Harmon
email to Lewis dated April 9, 2012 at 10:08 a.m.

[Lewis to Harmon]: "Yes I see..I spoke with Darlene last week and she has
received in several demand packages that she is in the process of evaluating and
will be making offers on. Darlene is on diary, I see her in the files...she said the
hold up seems to be the Attorneys getting her info that is needed, Tort Doc, liendoc, etc.
 and she does continue to follow up for same." (Id. at FIE 14144), Lewis
email to Harmon dated April 9, 2012 at 10:15 a.m.

[Harmon to Lewis]: "Joe - she needs to settle claims! 2 and 3 a month is not
going to cut it." (Id)., Harmon email to Lewis dated April 9, 2012 at 2:18 p.m.

(See also Exh. C, Harmon Dep. at 111:8-18.)

201. Harmon would typically participate in a decision to place an employee in her group

on Corrective Action or terminate his/her employment.(Pl. App. Ex. C, Harmon Dep. Tr. 95:2-

96:2; Pl. App. Ex. J, Lewis Dep. Tr. 113:1-117:10.)

202. Lewis, and Duffy, were never forced to place any employee on Corrective Action,

and only did so when they believed it was appropriate. (Pl. App. Ex. K, Duffy;Dep. Tr. 69:5-

70:21.)

203. Duffy testified that Lewis would make the initial recommendation for Corrective

Action to Duffy who would have to approve it and then send it on to Harmon for final approval.

(Id. at 70.)

204. On June 19, 2012, Lewis placed Barbee on oral warning for unsatisfactory

performance. (See Exh. 91, Barbee Warning, FIE 01706.) Barbee's oral warning makes specific

reference to "the fact that 2 to 3 settlements with payments in one month is not acceptable, as 2

to 3 settlements with payments per week is needed." (Id.)

205. Harmon admitted that Barbee's oral warning was "in line" with the emails she

had sent to Lewis in April 2012 concerning Barbee, as well as her comments to Bode

about Barbee's performance. (See Exh. C, Harmon Dep. at 113:18-114:3.)

206. At a meeting in the fall of 2012, the remaining adjusters in the King of Prussia

office were informed as follows:

> It was advised to all employees in the operation that there were openings within
> the Bristol West office, and that when Bristol West claims stopped coming into
> the Farmers system, that there would be a lower claim volume, and while it was
> not said there was going to be a reduction in force, it was indicated that there
> would be a lower workload coming in and that we would have a surplus of
> employees, and so everybody was encouraged, if they were interested in working
> for Bristol West, to apply for a Bristol West position in Delaware.

(See Exh. C, Harmon Dep. at 46:3-14; 69:10-17.)

207. The claims adjusters were also told that the positions in the Bristol West office

were for claims adjusters with experience handling assigned risk claims. (See Exh. 92,

Declaration of Mary Whetts at ¶ 4.)

208. Whetts averred that the adjusters with such experience were the older adjusters such

as Barbee, Bleau, and Whetts. (Id. at ¶ 5.)

209. Harmon testified when asked whether over-40 employees transferred to Bristol

West, "I believe people above and below 40. It was advised to all employees in the operation that

there were openings within the Bristol West office." (Pl. App. Ex. C, Harmon Dep. Tr. 45:23-

46:14.)

210. Whetts testified that an individual from Maryland who Harmon reported to [Virna

Alexander] announced at a group meeting at the King of Prussia office in January 2013 that

decisions as to which claims representatives would be let go in the reduction in force in King of Prussia would not be based on experience level. (Pl. App. Ex. L, Whetts Dep. Tr. 46:8-22.)

211. As a result, five of the six adjusters over forty remaining in the King of Prussia office, transferred to the Bristol West Farmers office in Wilmington, Delaware. (See Exh. C, Harmon Dep. at 46:15-48:4.)

212. The five older adjusters who transferred were Barbee, Bleau, Hackett, Hutchings, and Young, all of whom transferred from the King of Prussia office on December 16, 2012. (See Exh. C, Harmon Dep. at 46:15-48:3.) (See also Exh. 93, letter and email from defendant's counsel Adam Brown, Esq. dated August 10, 2015.)

213. The one older adjuster who declined a transfer to Bristol West because she was unable to get to Wilmington using public transportation - Whetts - was soon thereafter terminated as part of a reduction in force. (See Exh. L, Whetts Dep. at 46-48.)

214. Quinn averred that "Ms. Harmon, actively and directly, encouraged older and long term employees to move from the King of Prussia office to the Wilmington DE office 'Bristol West' and in my opinion there was an almost direct threat that if they did not move they would be terminated. Darlene Barbeee, Alayne Bleau, Loretta Hutchings, and Debbie Massey reluctantly transferred to the Bristol West office to retain their jobs."

215. Quinn admitted that any "pressure" for older employees to transfer to Bristol West was based on her own speculation. (Pl. App. Ex. G, Quinn Dep. Tr. 133:16-137:23.)

216. Quinn averred that she retired early because she "did not want to work in the kind of discriminatory atmosphere I experienced under Ms. Harmon's leadership." (See Exh. 11, QuinnDeclaration at ¶ 29.)

217. Quinn averred that when she voiced her concerns "that the longer term, older employees, were placed in positions of having to handle excessive workloads with incredibly high performance standards, I was advised by Ms. Harmon that as I was considered a 'role-model' and was respected by my peers, that this type of 'behavior" [speaking up and out] was not acceptable." (See also Exh. G, Quinn Dep. at 111:16-112:25.) (See also Exh. 11, Quinn Declaration at ¶ 24.)

218. In addition, Quinn testified that she had no personal knowledge of how many files were assigned to any other Claims Representative at any given time. (Pl. App. Ex. G, Quinn Dep. Tr. 65:14-67:2.) Moreover, Quinn testified that she had no personal knowledge of how big or small any other Claims Representative's workload at any given time. (Pl. App. Ex. G, Quinn Dep. Tr. 114 30:5-13.)

219. O'Kane averred that when Harmon became the head of the Pennsylvania Claims department, she observed what she believed to be age discrimination against her and her peers. O'Kane averred that in 2010 she wrote to HR to report the hostile work environment Julie Harmon created in the King of Prussia office.  (See Exh. 12, O'Kane Declaration at ¶¶ 7-9.)

220. O'Kane testified that her purported grievance against Harmon was not age discrimination, but favorable treatment of Farmers employees as compared to AIG legacy employees. (Pl. App. Ex. H, O'Kane Dep. Tr. 38:6-38:19.) And O'Kane admitted that she had no personal knowledge to support any belief that Harmon treated Farmers employees better than AIG legacy employees (Pl. App. Ex. H, O'Kane Dep. Tr. 38:24-40:20.)

221. Within a week, Harmon spoke with O'Kane about her complaint. (See Exh. 12, O'Kane Declaration at ¶ 10.) (See also Exh. H, O'Kane Dep. at 41:5-14.)

222. O'Kane testified, after speaking with Harmon she told Human Resources that she considered the matter resolved, and she never again had occasion to complain about the way Harmon was treating her. (Pl. App. Ex. H, O'Kane Dep. Tr.3:14-44:13.)

223. O'Kane averred that approximately six months later, her supervisor DeWaghe, at the direction of Harmon put her on a verbal warning for a low score on a single file. (See Exh. 12, O'Kane Declaration at ¶¶ 9-13.)

224. Harmon testified that she did not remember directing O'Kane's supervisor to put her on Corrective Action. (Pl. App. Ex. C, Harmon Dep. Tr. 36:19-22.) Moreover, O'Kane admitted that she had not received a passing score on the audit of the file in question, that, to her knowledge, nothing was ever placed in her personnel file regarding the file, and that she never heard anything about that warning or that file again. (Pl. AppEx. H, O'Kane Dep. Tr. 45:25-48:7.)

225. O'Kane averred that she "retired early [after 36 years in the industry] because I didn't want to work in the kind of discriminatory atmosphere I'd experienced under Ms. Harmon's leadership. (See Exh. 12, O'Kane Declaration at *if* 24.) (See also Exh. H, O'Kane Dep. at 7:22-8:8.)

226. There is no evidence that Quinn and O'Kane ever made formal complaints to Farmers Human Resources that would have triggered an investigation. Bode testified that she had no recollection of such a complaint. (Pl. App. Ex. B, Bode Dep. Tr. 197:23-198:15.)

227. Liability Claims Manager at the King of Prussia branch, DeWaghe, retired when she was in her late fifties. Following DeWaghe's retirement, there was a period of time when there was no Liability Claims Manager at the King of Prussia office. As Harmon testified, the need for a new Liability Claims Manager arose from the growth of the King of Prussia office,

and the position was not reestablished until sometime after DeWaghe's retirement. (Pl. App. Ex. C, Harmon Dep. Tr. 40:24-41:21.) Deanna Dimeo, who was in her thirties at the time, was hired as the new Liability Claims Manager at the King of Prussia office.

228. At the time when Harmon took over as State Manager in January, 2010, sixteen of the twenty-four claims adjusters in the King of Prussia office were over the age of 40. (See Exh. C, Harmon Dep. at 42:7-44:5.)

229.  Harmon testified that when she was terminated in March 2013 as part of the reduction in force, "[m]ore than two [Claims Representatives over 40] remained."
 (Pl. App. Ex. C, Harmon Dep. Tr. 44:16.)

230. Harmon hired nine adjusters during her tenure - seven of nine were in their twenties and the other two were in their thirties. (See Exh. C, Harmon Dep. at 51:15-52:2; 52:9-53:20; 56:1-57:21; 60:2-11; 61:13-63:3.) (See also Exh. 98, Brazwell 2012 Year-End Assessment, FIE 01772-01775; Exh. 19, Defendant Farmers First Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories and First Request for the Production of Documents, pp. 4-5.)

231. In less than two and a half years as State Manager, Harmon terminated four adjusters over age 40, including both plaintiffs. (See Exh. C, Harmon Dep. at 45:10-22; 46:20-47:15;151:19-24.)

232. During the less than two and a half years Harmon was the Pennsylvania State Manager, four employees raised concerns and/or filed formal complaints of age discrimination, with Quinn and O'Kane first complaining in 2010 that older adjusters were being treated unfairly in 2010, and Maiorini and Darlene Barbee complaining in 2011 that older adjusters were being

discriminated against based on their age. (See Exh. C, Harmon Dep. at 77:23-79:3.) (See also Exh. B, Bode Dep. at 21:5-10.; Exh. 12, O'Kane Declaration at 7-9.)

233. O'Kane averred that "I saw what can best be described as 'nit picking' criticism that was targeted against most of the older claims adjusters in our office in order to develop a paper trail for discipline or discharge. Many of these people were terminated, forced to resign or managed to 'escape' to a different office (the 'Bristol' office) in Wilmington, DE where Julie Harmon did not have control over them."

234. O'Kane admitted that she had no personal knowledge of other employees' performance or why any employee was disciplined. (Pl. App. Ex. H, O'Kane Dep. Tr. 13:14-22; 26:16-27:5; 28:14-21) (admitting no personal knowledge of why other employees were put on performance improvement plans or whether Farmers held all employees to same standards).)

235. On June 19, 2012 Maiorini and Barbee filed formal complaints about age discrimination in the King of Prussia office. (See Exh. 96, Bode Summary of Investigation at FIE 02291.)

236.  Farmers assigned Bode in Human Resources the responsibility to investigate their complaints. (See Exh. B, Bode Dep. at 59:13-16; 60:1-6.)

237. In reviewing Bode's investigation, plaintiffs' human resources expert. Elizabeth Gramigna ("Gramigna"), wrote:

She [Ms. Bode] admits that Ms. Harmon's group, including Mr. Lewis, consulted with her on an "ongoing basis" with regard to managing performance of the group, including Ms. Maiorini and Ms. Barbee. It was those very decisions that were being challenged in this investigation.
These circumstances arguably made Ms. Bode part of the management team, or at the very least, an interested party and therefore, clearly presented a conflict of interest.

(See Exh. 97, Gramigna Report at pp. 7-9.)

238. Farmers' human resources expert, Christine P. O'Hearn, Esq., ("O'Hearn")

countered that

There is . . . nothing in the publications cited by Ms. Gramigna which supports the conclusion that Ms. Bode could not be an impartial or objective investigator. The 7/23/15 SHRM guidance notes the investigator should have the ability to investigate objectively and without bias, have no stake in the outcome, not have a personal relationship with the involved parties and the outcome should not directly affect the investigator's position in the organization. The Association of Workplace Investigators ("AOWI") Guiding Principles similarly state the investigator should be impartial and objective. The 2013 SHRM guidelines relied upon by Ms. Gramigna specifically state HR representatives usually investigate all employee complaints other than those complaints "made against HR." This was not a complaint against HR. The only basis for the conclusion that Ms. Bode was not objective and impartial was that she was the HR Business Partner for the Pennsylvania Office and had been consulted regarding prior disciplinary actions involving plaintiffs. However, none of the publications relied upon by plaintiff's expert state simply because an HR professional is the designated HR person for that business unit or because the HR professional had been involved in reviewing prior disciplinary issues for the complainant that they cannot or should not conduct an investigation. More importantly, there is no actual evidence in the record to support the conclusion that Ms. Bode was biased or not independent. She had no personal relationship with the parties involved and had no stake in the outcome. The evidence in the record suggests just the opposite. Specifically, in her deposition, Ms. Bode testified that on several occasions she had refused to approve certain disciplinary action requested by the Pennsylvania Office when she did not feel it was appropriate or fair to the employee. This included one occasion where management requested to terminate Ms. Maiorini and she rejected that request and instructed them to allow time for the performance improvement plan to work advising "The purpose of Corrective Action is to work extensively with an employee in an attempt to correct the performance." This affirmatively demonstrates that Ms. Bode was not biased, she was acting objectively and independently, and she was in fact properly serving in her role as the "gatekeeper".

(Supp. App. Ex. 15, Report of Christine O'Hearn, 3.)

239. According to Gramigna, Bode likewise failed to interview Lewis, the direct

supervisor of both complainants, see Exh. 97, Gramigna Report at p.13; did not review which

adjusters were put on Corrective Action for having late DOI status letters, see Exh. B, Bode Dep.

at 109:23-110:16; nor did she request any documents or correspondence between Harmon and

the rest of the King of Prussia office management. See Exh. 97, Gramigna Report at p.9.

240. O'Hearn concluded that:

[W]hile it may have been beneficial to interview Mr. Lewis and to interview the
management employees separately, there is nothing that requires that be done and
it does not appear to have had any impact in this case as the majority of
information relied upon by Ms. Bode to investigate claims of disparate treatment
was the statistical analysis she conducted of extensive objective data.
(Supp. App. Ex. 15, Report of Christine O'Hearn, 4.)

241. Gramigna concluded that Bode's key findings exonerating Farmers of age

discrimination were biased and "failed to follow several fundamental standard practices to deter

and prevent harassment and discrimination." See Exh. 96, Bode Summary of Investigation dated

August 6, 2012, FIE 02291-02293. See Exh. 97, Gramigna Report at pp. 16-17.

242.  O'Hearn concluded that"Farmer's investigation of the complaints in this matter did

not deviate from any applicable standards of care." (Supp. App. Ex. 15, Report of Christine

O'Hearn, 6.)

243.  Maiorini and Barbee were out of the King of Prussia office by the end of 2012:

Plaintiff Maiorini was terminated November 8, 2012 and Barbee was transferred to the Bristol

West office in Wilmington, Delaware on December 16, 2012. (See Exh. 39, Request for HR

Consult on Involuntary Termination, FIE 00604-00605.) (See Exh. C, Harmon Dep. at 46:15-

17.) (See also Exh. 93, letter from defendant's counsel Adam Brown dated August 10, 2015.)


**ANALYSIS**

**1.  Age Discrimination under ADEA and PHRA**

Disparate treatment claims brought under the ADEA and the PHRA are analyzed in

accordance with the framework first set forth in McDonnell Douglas Corp. v. Green, 411 U.S.

792 (1973). See <u>Narin v. Lower Merion School Dist.</u>, 206 F.3d 323, 331 (3d Cir. 2000) (applying

the <u>McDonnell Douglas</u> framework to an ADEA claim); see also <u>Kelly v. Drexel University</u>, 94

F.3d 102, 105 (3d Cir. 1996) (indicating that claims for discrimination under the PHRA are

subject to the standards for claims for discrimination under the ADEA). This framework requires

that the plaintiff first establish a prima facie case of age discrimination. <u>Reeves v. Sanderson</u>

<u>Plumbing Products, Inc.</u>, 530 U.S. 133, 142 (2000).

 A plaintiff can establish a prima facie case of age discrimination by demonstrating that:

(1) she is at least forty years old; (2) she was qualified for the position from which he was

discharged; (3) she was dismissed despite being qualified; and (4) her "employer retained

someone similarly situated to him who was sufficiently younger." <u>Monaco v. American General</u>

<u>Assurance Co.</u>, 359 F.3d 296, 305 (3d Cir. 2004); see also <u>Siegel v. Alpha Wire Corp.</u>, 894 F.2d

50, 53 (3d Cir. 1990). After the plaintiff has established a prima facie case, the burden shifts to

the defendant to produce evidence of a legitimate nondiscriminatory reason for the adverse

decision. <u>McDonnell Douglas</u> <u>Corp.</u>, 411 U.S. at 802. If the defendant satisfies this burden, the

plaintiff must show that the nondiscriminatory reason articulated by the defendant is actually a

pretext for discrimination. <u>Id</u>. at 804.

 Farmers does not argue that either plaintiff has failed to establish a prima facie case of

age discrimination. Farmers has, however, articulated a legitimate non-discriminatory reason for

terminating both Reichardt and Maiorini---poor performance resulting in numerous disciplinary

actions. Therefore, the Court will focus its analysis solely on the third step, that is, whether either

plaintiff has sufficiently demonstrated that Farmers' reasons for discharging them were

pretextual.

A plaintiff can prove pretext by presenting evidence that: (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a finder of fact could reasonably conclude that each reason was a fabrication; or (2) allows a finder of fact to infer that discrimination was more likely than not a motivating or determinative cause of the employment action. Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).

Under the first prong of the test, the plaintiff cannot discredit the defendant's proffered reasons by merely showing that the employment decision was wrong or mistaken. Id. at 765. Instead, the plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3d Cir. 1997). "In simpler terms, [the plaintiff] must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." Id. at 1109. "The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." Id.

 Under the second prong of the test, the plaintiff must "point to evidence that proves age discrimination in the same way that critical facts are generally proved-- based solely on the natural probative force of the evidence." Id. at 1111. This burden can be met a number of ways, including showing "that the employer previously discriminated against [the plaintiff], that the employer has previously discriminated against other person's within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." Simpson v. Kay Jewelers, 142 F. 3d 639, 645 (3d Cir. 1998).

Turning to the first <u>Fuentes</u> prong, the Court finds that neither plaintiff has raised a genuine issue of material fact. On the contrary, the record contains numerous well-documented instances of poor performance by both plaintiffs that resulted in numerous disciplinary actions.

With respect to Reichardt, the July 28, 2010 email she received from Harmon cited numerous performance deficiencies, including) "the incorrect drafting of both disclaimer and reservation of rights letters, on the same claims, at the same time;" 2) "inconsistency in file audit results;" 3) on one claim, discussing with the "claimant attorney information potential adverse to the insured;" 4) failure to return phone calls; 5) failure to properly code  reserves; 6) the need to claim ownership of a file once it is assigned.  (See Exh. C, Harmon Dep. at 236:17-238:3.) (See also Exh. 62, Harmon email to Reichardt dated July 28, 2010, FIE 21916-21918.)

 In another email to Reichardt on August 16, 2010, Harmon advised that "[D]uring the recent compliance audit completed on status letters, 1 file of the 1 file audited was not in compliance. The expectation is 100% compliance. You have been previously advised of this issue on 9/30/09 and 2/24/10." See (Exh. C, Harmon Dep. at 247:14-248:6.) (See also Exh. 63, Harmon/Reichardt email exchange dated August 16, 2010, at FIE 03054-03055; Exh. 99, Reichardt Declaration at ¶ 28.)

 On November 2, 2010, Harmon sent an email to Lewis criticizing one of Reichardt's files because "Medicare procedures were not followed." (See Exh. 64, Harmon/Lewis email chain dated November 2, 2010, FIE 22313.)

On December 14, 2010, Harmon informed Lewis that she was putting Reichardt "in as a PM [Partially Meets] for both Behaviors and Support as your write up indicates that she is requiring a higher level of support than would be expected with her level of experience." (See Exh. 67, Harmon/Lewis email chain with spreadsheet, FIE 21961-21965 and FIE 21967.)

On January 3, 2011, Harmon placed Reichardt on Corrective Action for having an untimely DOI status letter, (see Exh. 68, Reichardt Warning, FIE 00320)

On January 6, 2011, three days after Reichardt was put on Corrective Action for an untimely DOI status letter, Duffy told Lewis that Reichardt "need[s] to feel pushed." (See Exh. K, Duffy Dep. at 56:4-8.)

On April 6, 2011, Farmers issued Reichardt a Verbal Counseling-Performance. (App. Ex. 9, Reichardt Dep. Tr. 132:20-22; App. Ex. 47, 4/6/11 Memo to D. Reichardt re Verbal Counseling– Performance.) That letter set forth several areas where Reichardt's performance was "unacceptable" and cautioned that failure to correct her performance could lead to her termination. The Verbal Warning ran for 60 days, or until June 1, 2011. (Id.)

On May 11, 2011, Duffy directed Lewis to "spot check" Reichardt's files  because dozens of her claims had shown up on a list of claims missing Medicare information, as contrasted with all of the other claims representatives on the list, who had only a handful of claims show up. (Pl. App. Ex. 71, Duffy email to Lewis dated May 11, 2011, FIE21768-21773 at 21770-21773.)

After being removed from Corrective Action on June 8, 2011, Reichardt was then placed on Corrective Action yet again (Oral Warning) on November 10, 2011 for "unsatisfactory performance." (See Exh. 72, Corrective Action Memo dated November 10, 2011from Lewis to Reichardt, FIE 00312.) Reichardt's unsatisfactory performance included failing to timely send out Pennsylvania status letters, failing to consistently follow Farmers Liability Strategy, failing to submit accurate Pure Exposure Values, failing to negotiate within the established range of values, failing to properly execute releases, failing to properly label, failing to accurately

document Medicare investigations, failing to utilize XM evaluation and failing to confirm if medical expenses are truly out-of-pocket. (Id.)

On January 12, 2012, Reichert's November 10, 2011 Oral Warning was escalated to a Written Warning. (App. Ex. 9, Reichardt Dep. Tr. 173:21-25; App. Ex. 53, 1/12/1[2] Memo to D. Reichardt re Written Warning – Performance.)

On January 16, 2012, Harmon asked Lewis to investigate more broadly whether Reichardt had been neglecting her files. (App. Ex. 54, 1/16/12 Email from J. Lewis to J. Harmon.) As a result of the investigation, Lewis issued Reichardt a Probation/Final Warning and reported to Harmon that after reviewing Reichardt's pending files, he discovered that she had 33 claims with incomplete initial investigations and delayed file handling, and another six files with no activity for over two weeks. (App. Ex. 55, 1/24/12 Memo to D. Reichardt re Probation/Final Warning - Probation.)

Lewis also advised Harmon that Reichardt had made a notation in one of those files stating that she had left a message for a claimant. However, the file also contained a notation from a claims representative that had worked the file previously, which stated the number Reichardt allegedly left was disconnected. When Lewis called the number, he confirmed that it was not a working number. (App. Ex. 56, 1/18/12 Notes of J. Lewis; App. Ex. 57, 1/17/12 Email from J. Lewis to M. Duffy; App. Ex. 58, 1/17/12 Email from J. Harmon to J. Lewis.)

On January 20, 2012, Lewis received a complaint from a claimant's attorney stating that he had left Reichardt several messages but she had not returned his calls. (App. Ex. 59, 1/20/12 Email from D. Reichardt to J. Lewis.)

On January 24, 2012, Farmers placed Reichardt on Final Probation. The Probation period was for 30 days, until February 24, 2012, and advised that failure to improve her performance

could result in further corrective action. (App. Ex. 9, Reichardt Dep. Tr. 194:7-13; App.Ex. 55, 1/24/12 Memo to D. Reichardt re Probation/Final Warning - Probation.)

Reichardt made an abrupt request for medical leave within days after Lewis had discovered that she had made an entry in one of her files stating that she had left a message for a claimant to a non-working number, which he, Harmon, and Duffy viewed as dishonest. (Reichardt App. Ex. 60, Email from J. Lewis to J. Bode dated January 11, 2012, FIE 09109-09112.)

After Reichert returned to work July 9, 2012. (App. Ex. 76, 7/9/12 Email from J. Lewis to M. Duffy), Lewis met with Reichardt  and reissued the Probation Warning Memo. However, the Memo was updated to address concerns Farmers had about Reichardt not obtaining management approval prior to being out of the office from January 30, 2012 until February 13, 2012 and for leaving an incorrect phone number for Lewis on her voicemail (App. Ex. 9, Reichardt Dep. Tr. 220:18-20; App. Ex. 77, 7/9/12 Memo to D. Reichardt re Probation/Final Warning - Performance.) Reichardt refused to sign the Memo because she did not agree with it. (App. Ex. P. Reichardt Dep. Tr. 174.)

On August 16, 2012, Lewis received the following voicemail message from a customer:

> Ah, yes, Mr. Lewis, my name is Cecilia [M. (full last name stated on voicemail but shortened here in deference to the privacy interests of this claimant)]. I'm calling in reference to claim 1021813341. It was being handled by Debbie Reichardt who contacted me several times and she talked about, you know, my claim for, I guess, pain and suffering you'd call it. I was injured in car accident that happened on the 16th of July, however, *I don't really want to deal with her*. She—the last I talked with her was last week. *She was supposed to meet me, she set up a meeting, she didn't show up and then she called me after I called her a dozen times saying that she had left a voice mail at a number which clearly was not mine*. So, you know, I feel like I'm getting the run-around from her and I would really appreciate it if you could handle this going forward and if you could call me back so we could get some resolution to this. I would really appreciate it.

Thank you. My number is 267-394-[(last four digits provided in voicemail but redacted here in deference to the privacy interests of this claimant)].

(App. Ex. 79, voicemail from Cecilia M. produced in native (emphasis added).)

Later that day, Lewis, Duffy and Harmon recommended to Bode that Farmers terminate Reichardt's employment. (App. Ex. 80, 8/16/12 Email from J. Lewis to J. Bode.) Human Resources approved the termination on August 23, 2012, and Reichardt was notified of her termination on the same day. (App. Ex. 81, 8/23/12 Email from J. Bode to J. Lewis; App. Ex. 82, 8/23/12 Email from J. Bode to J. Lewis.)

With respect to Maiorini, on May 15, 2012, Farmers placed Maiorini on a 60-day, Oral Corrective Action Warning for poor performance, including 1) failing to make 24 hour contact attempts with all parties involved in an accident; 2) failing to send a closing letter to the insured when the final injury claim is settled and closed; 3) failing to send a settlement letter to all third party claimants advising them that a settlement check was sent to their Attorney; 4) failing to engage in aggressive claims handling; 5) failing to make timely responses to all direction given by management in claim files and emails; 6) failing to handle coverage units quickly and thoroughly; 7) needing to achieve Early Contact Settlement goal of 35%; 8) failing to pay attention to detail; 9) failing to issue settlement checks within 3 calendar days; 10) failing to send out timely Pa status letters and 11) failing to independently verify an insured's vehicle identification number.  (App. Ex. 1, Maiorini Dep. Tr. 176:10-12; App. Ex. 44, 5/15/12 Memo to A. Maiorini re Oral Warning - Performance.)

 During the 60-day Warning period, Lewis e-mailed Maiorini about additional performance issues. (App. Ex. 49, 6/2/12 Email from J. Lewis to A. Maiorini; App. Ex. 50, 6/4/12 Email from M. Duffy to J. Lewis; App. Ex. 51, 6/7/12 Email from V. Hawkins to A.

Maiorini; App. Ex. 45, 5/25/12 Email from J. Lewis to J. Harmon; App. Ex. 46, 5/20/12 Email

from M. Duffy to J. Lewis; App. Ex.47, 5/31/12 Email from J. Lewis to A. Maiorini.), including

noting that in one file Maiorini had accessed the PIP representative's file and simply cut and

pasted that representative's CLEAN, which utilized different formatting, into Maiorini's own

file. (Id.) Maiorini had never contacted the insured, or conducted any independent evaluation of

the claim. (Id.) This discovery by Lewis, among other things, formed the basis for Lewis's

request to escalate Maiorini's Corrective Action before the end of the oral warning period, "due

to the serious potential business implications of her actions." (Pl. App. Ex. 83, Bode/Lewis

Email Chain, FIE 15329-15331 at FIE 15329.)

On May 25, 2012, Lewis requested to escalate Maiorini's discipline from an oral to a

written warning despite the fact that the Oral Warning had not expired  (See Exh. 83, Lewis

email to Bode, FIE 15329-15331.) (See also Exh. 82, Maiorini Oral Warning, (stating that the

warning will extend through June 24, 2012).)

On June 19, 2012, Farmers issued Maiorini a 30-day Written Warning Letter.

(App. Ex. 1, Maiorini Dep. Tr. 186:22 – 187:23; App. Ex. 52, 6/19/12 Memo to A. Maiorini re

Written Warning - Performance.)

 On August 2, 2012, Farmers extended the June 19 Written Warning for 30

additional days (App. Ex. 1, Maiorini Dep. Tr. 213:17-21; App. Ex. 53, 8/2/12 Memo to A.

Maiorini re Written Warning - Performance.)

Farmers did not take Maiorini off Corrective Action because, during the 30-day Warning

period, Lewis observed repeated instances of Maiorini simply failing to work her assigned claims

in a timely and appropriate manner, comply with Farmers' Liability Strategy, or the

Pennsylvania Fair Claims Practices Act. (Maiorini App. Ex. 49, Email from J. Lewis to A.

Maiorini dated June 2, 2012, FIE 15436; Maiorini App. Ex. 50, Email from M. Duffy to J. Lewis dated June 4, 2012, FIE 15445; Maiorini App. Ex. 51, Email from V. Hawkins to A. Maiorini dated June 7, 2012, FIE 15479.)

On September 4, 2012, Farmers escalated Maiorini to a 30-day Probation/Final Warning (App. Ex. 1, Maiorini Dep. Tr. 218:17-22; App. Ex. 54, 9/4/12 Memo to A. Maiorini re Probation/Final Warning - Performance.)

On October 9, 2012, Farmers extended the probation another 30 days (App. Ex. 1, Maiorini Dep. Tr. 228:1-7; App. Ex. 55, 10/9/12 Memo to A. Maiorini re Probation/Final Warning Extension - Performance.)

Each of these letters explains that Maiorini's performance in the same basic areas continued to suffer with little or no improvement. (App. Ex. 53, 8/2/12 Memo to A. Maiorini re Written Warning – Performance; App. Ex. 54, 9/4/12 Memo to A. Maiorini re Probation/Final Warning – Performance; App. Ex. 55, 10/9/12 Memo to A. Maiorini re Probation/Final Warning Extension - Performance.)

During the period between June 19 and November 9, 2012, Lewis sent several emails to Maiorini addressing the performance issues raised in the Warning Letters. (App. Ex. 49, 6/2/12 Email from J. Lewis to A. Maiorini; App. Ex. 67, 9/18/12 Email from V. Seguro to J. Lewis; App. Ex. 66, 10/12/12 Email from J. Lewis to A. Maiorini; App. Ex. 67, 10/28/12 Email from J. Lewis and A. Maiorini (noting Medicare issue in October 2012); App. Ex. 68, 11/7/12 Email from J. Lewis to A. Maiorini (noting Medicare issue in November 2012).)

During this time period, Lewis received messages from claimants and other carriers that Maiorini either was not returning their phone calls or her voicemail was full and they were unable to leave messages for her. (App. Ex. 70, 6/1/12 Email from J. Lewis to

joe.lewis@hpcs.com; App. Ex. 71, 10/22/12 Email from J. Lewis to A. Maiorini; App. Ex. 72, 10/28/12 Email from J. Lewis and A. Maiorini; App. Ex. 73, 11/5/12 Email from J. Lewis to A.Maiorini.)

Maiorini also sent several emails to Lewis acknowledging that she was not meeting the Company's goals to conduct face-to-face meetings with claimants or close files within 90 days of receipt. (App. Ex. 57, 7/16/12 Email from A. Maiorini to G. Chan and J. Lewis; App. Ex. 58, 7/27/12 Email from A. Maiorini to G. Chan and J. Lewis; App. Ex. 59, 8/3/12 Email from A. Maiorini to G. Chan and J. Lewis; App. Ex. 60, 8/10/12 Email from A. Maiorini to G. Chan and J. Lewis; App. Ex. 61, 10/4/12 Email from A. Maiorini to G. Chan and J. Lewis; App. Ex. 62, 10/19/12 Email from A. Maiorini to G. Chan and J. Lewis; App. Ex. 63.) In November 2012, Lewis with additional approval from Harmon recommended to Bode that Maiorini's employment should be terminated. (App. Ex. 74, Memo from J. Lewis to J. Bode re Request for HR Consult on Involuntary Termination.)

In their Declarations, plaintiffs attempt to refute some of these charges of poor performance and disciplinary action.  (See Plaintiffs' Exh. 100, Maiorini Declaration at ¶¶ 9-18; Plaintiffs' Exh. 99, Reichardt Declaration at ¶¶ 17-26.) However,"[n]either a simple denial of the charges against [Maiorini and Reichardt], nor [their] own rosier perception of [their] performance," meets their burden of demonstrating a post hoc fabrication by Farmers. Fatzinger v. Lehigh Valley Hosp., 130 F. Supp. 2d 674, 679 (E.D. Pa. 2001) (granting employer summary judgment where plaintiff disputed the correctness and fairness of his employer's performance criticisms); *see also* Horvat v. Forbes Regional Hosp., 184 Fed App'x 216, 219 (3d Cir. 2006) (affirming grant of summary judgment for employer where plaintiff did not deny having certain performance deficiencies, and instead disputed that deficiencies were her fault, because "[a]t

most, her argument established that [employer] failed to give her the benefit of the doubt."); Bernhard v. Nexstar Broadcasting Group, Inc., 146 Fed. App'x. 582, 586 (3rd Cir. 2005) (holding that plaintiff's reliance on his own sworn declaration to contradict defendant's view of his work performance did not raise an issue of pretext). Quite simply, the plaintiffs' perceptions of themselves are not relevant. Rather it is the perception of the decision maker that is relevant. Billet v. Cigna Corp., 940 F.2d 812, 825 (3d Cir. 1991).

Neither plaintiff offers any evidence that Farmers did not honestly believe that either plaintiff performed deficiently or engaged in misconduct as specifically detailed above. In addition, the record clearly reveals that many, if not all, of the performance problems occurred and that they would be sufficiently serious to merit discipline and discharge. The record reveals that Farmers gave both plaintiffs numerous chances to improve their performances, but instead their performances only worsened to the point that Farmers had no choice but to terminate them. Plaintiffs' denials go to the business wisdom of terminating plaintiffs and not whether their termination was because of age discrimination. As a result, viewing all the facts in a light most favorable to plaintiffs, the court concludes that no reasonable factfinder could find that Farmers' reason for terminating both plaintiffs was so plainly wrong that it could not have been its real reason.

Next, under the second Fuentes prong, the Court examines whether a fact finder could reasonably believe that an invidious discriminatory reason was more likely than not a motivating of determinative cause of Farmers' discharge of plaintiffs.

Plaintiffs first contend that beginning in 2010, Farmers used the only subjective category of "Behaviors" to downgrade the overall ratings of both plaintiffs which Harmon then used to justify their termination. In the first instance, in 2010, Farmers made a decision that every

employee rated at least "Fully Meets Objectives" in the "Behaviors" category would receive an overall rating of "Fully Meets," even if they received a rating of "Partially Meets" or "Below Expectation" in one of the objective categories. The employees' overall ratings were "upgraded" so that they could participate in Farmers' bonus pool, which had excess funds to distribute that year. (Pl. App Ex. C, Harmon Dep. Tr. 157:16-158:10-13, 18; 265:8-266:9.) This exception was applied uniformly to all employees who satisfied the criteria, including workers over 40.

Despite also receiving low ratings for "Behaviors" and, therefore, overall low ratings in 2010, older representatives such as Barbee, Quinn, Hackett and O'Kane were not terminated by Farmers. Therefore, the rating each received for "Behaviors" in 2010 did not adversely affect their employment status with Farmers. If Farmers was so intent on "performance managing out" all of the older representatives as plaintiffs claim, Famers could have performance managed out Barbee, Quinn, Hackett, O'Kane and other older representatives at the same time. However, the record reveals that none of the other older workers had engaged in the same level of serious poor performance that plaintiffs Reichardt and Maiorini had repeatedly engaged in. Therefore, the low overall performance ratings Reichardt and Maiorini received were just another factor that added to what the undisputed evidence reveals to be an already overwhelming case for terminating Reichardt and Maiorini. (Exs. 38 39) ("Ms. Reichardt has not been a MEETS employee since 2009." ("Ms. Maiorini has not been a MEETS employee since 2010.")

An inference of unlawful discrimination arises when "similarly situated persons not within the protected class were treated more favorably [than plaintiff]." Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 n. 7 (3d Cir.2003). As a result, the relevant inquiry becomes whether either plaintiff can point to other claims representatives who were similarly situated to plaintiffs. Context matters in assessing similarity. See McCullers v. Napolitano, 427 F. App'x 190, 195 (3d

Cir.2011). In workplace discrimination, relevant contextual factors include "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Id*., quoting* Radue v. Kimberly–Clark Corp. 219 F.3d 612, 617 (7th Cir.2000).

Plaintiffs have not submitted any evidence that *any* other claims representative, let alone a younger claims representative, committed the same level of poor performance as both plaintiffs and was not terminated. On the contrary, the record reveals that in 2011, younger representative McMillan (31) received an overall rating of "Partially Meets" for 2011 and, after being on Corrective Action during 2011, was terminated in 2012 for his failure to meet Farmers' performance expectations. (Supp. App. Ex. 11, McMillan 2011 Year-End Assessment, FIE 02087-02090.)  Also in 2011, younger representative Clare (29) received five warning memoranda and was on Corrective Action for the majority of 2011. (Supp. App. Ex. 7, Verbal Counselling Memo dated April 1, 2011, FIE 02540-02553.)

Plaintiffs also argue that Farmers reasons are pretextual because Farmers issued Corrective Actions to older claims representatives in **2011** (Reichardt, Maiorini, Hackett and Barber) for having only a single late DOI status letter whereas Farmers did not issue Corrective Actions in **2012** to younger claims representatives (Bressi, Traugh) for having multiple late DOI status letters. However, Harmon testified that the discrepancy existed because it was Farmer's policy in 2011 to have zero tolerance in regard to late DOI letters because Farmers had failed the 2010 Market Conduct Examination. (See Exh. C, Harmon Dep. at 91:9-19; 92:16-20.) (See also Supp. App. Ex. 5 Report of Market Conduct Examination of Bristol West Insurance Company, FIE 22662-22727; Supp. App. Ex. 6, Commonwealth of Pennsylvania Insurance Department,

Market Conduct Examination Report of 21st Century Indemnity Insurance Company, FIE 22728-22785.) Moreover, the record reveals that Farmers also put two younger representatives, Clare and McMillan, on Corrective Action in 2011 and 2012 respectively for having at least one late DOI status letter. (Supp. App. Ex. 7, Verbal Counselling Memo dated April 1, 2011, FIE 02540-02553 at 02540); (Supp. App. Ex. 8, Written Warning Memos, FIE 02076-02086 at 02083.)

According to Harmon, by 2012, Farmers was no longer responding to the adverse findings of the Pennsylvania Department of Insurance. As a result, Farmers stopped issuing warning letters for a single violation. Rather, Farmers viewed failures to send such letter as part of overall performance management, *i.e.,* was it indicative of a failure to proactively and properly manage files.

Plaintiffs also argue that Farmers' reasons for terminating them are pretextual because once Farmers placed an older employee into the Corrective Action process, Farmers would intensively scrutinize that older employee's files and demand a level of perfection that would be impossible to meet. Indeed, Lewis told Maiorini (whom he had placed on written warning after discussion with Harmon), "You have to be perfect because you're on written warning and everything you do is being looked at completely and you have to be absolutely perfect." (See Exh. F, Maiorini Dep. at 166:22-167:6.) (See also Exh. 100, Maiorini Declaration at ¶ 17.) Farmers readily admitted that it scrutinized the files of representatives placed on Corrective Action more closely than others to discover any errors. Specifically, Human Resources Manager Bode testified that, "[e]verybody is treated the same up to the point you are put on Corrective Action, at which point it would be my expectation that the leader would invest more time working with that individual and coaching them to improve their performance. That is what the process is designed for." (See Exh. B, Bode Dep. at 109:13-22.) In this regard, the record reveals

that older employees such as Bleau and Barbee, were put on Corrective Action, but then removed from it after they addressed their performance issues. (Supp. App. Ex. 9, Memo regarding Removal from Corrective Action, FIE 01728.)  (Supp. App. Ex. 10, Memo regarding Release from Oral Warning-Performance, FIE 01716.) It is only obvious that a representative, whether younger or older, who was placed on Corrective Action would have his files examined more closely to ensure that the representative was not continuing to make the same mistakes. Plaintiffs have not submitted any specific evidence that younger representatives who were placed on Corrective Action were not held to the same level of perfection as the older representatives.

Plaintiffs refer to the Declarations of Quinn and O'Kane in which both averred that they believed all the older adjusters, including both plaintiffs, were having their files picked apart while younger adjustors were not being subject to the same level of scrutiny. (See Exh. 11, Quinn Declaration at ¶¶ 9-10, 17.) (See also Exh. 12, O'Kane Declaration at ¶¶ 19-23.) However, both Quinn and O'Kane subsequently admitted at deposition they had no personal knowledge of any particular claims representative being subject to greater scrutiny. (Pl. App. Ex. G, Quinn Dep. Tr. 72:20-84:5; Pl. App. Ex. H, O'Kane Dep. Tr .12:19-15:21, 24:19-26:20.)  In fact, the only "nitpicking" that Quinn was actually able to identify at her deposition was a one-time criticism of Maiorini's clothing. (Pl. App. Ex. G, Quinn Dep. Tr. 101:7-102:24.)

Maiorini testified that she had spoken with older people in the office who believed that younger people in the King of Prussia office were not being reprimanded. (Maiorini Dep. at 159.) However, Mairoini also admitted that she did not remember whether these older people had told her that they had spoken to supervisors of the younger people to verify whether or not the younger people had been reprimanded. (Id.) Maiorini further admitted that the older people had not looked through the files of the younger people to verify if there had been any reprimands and

that she had not spoken with the supervisors of the younger people to confirm whether or not they had been reprimanded (Id. at 159-160.)

Maiorini also testified, "The older people all agreed that they were picking little tiny things out of everybody's file. Nobody's perfect, so you're always going to find those things. And when I talked to the younger people, they said they were feeling no such pressure." (Pl. App. Ex. F. Maiorini Dep. Tr. 156-157.)  However, Maiorini further testified that she did not have any personal knowledge, based on conversations with supervisors, of whether or not younger people had been reprimanded for the same mistakes and deficiencies for which she had been reprimanded. (Pl. App. Ex. F, Maiorini Dep. Tr. 159:6-160:4.).

Plaintiffs also argue that they have demonstrated pretext when Farmers accelerated the disciplinary process of plaintiffs in violation of Farmers own established guidelines, to the extent that even human resources became alarmed.

Specifically, plaintiffs argue that the evidence shows that, on May 25, 2012, only ten days after placing Maiorini back on Corrective Action with an oral warning, Harmon attempted to escalate Maiorini from an oral to a written warning. Plaintiffs contend that as a result of Harmon's attempt to so rapidly escalate Maiorini's Corrective Action, even Human Resources representative Bode became alarmed as she wrote as follows: "I am concerned that continually escalating the process may give the impression that we are not adequately allowing the Corrective Action process to work."  Plaintiffs point out that in her role as Human Resources Manager, Bode also stated that she was "concerned because I have received this request from the [Pennsylvania] team a number of times over the last year." see also Plaintiffs' Exh. B, Bode Dep. at 166:17-21.

The evidence reveals, however, that it was Lewis, not Harmon, who requested that Maiorini's oral warning be escalated to a written warning and that he made the request only after reviewing one of Maiorini's files. During his review, Lewis observed that the format of Maiorini's CLEAN looked different. (Id.) Upon investigation, he realized that Maiorini had accessed the PIP representative's file and simply cut and pasted that representative's CLEAN, which utilized different formatting, into Maiorini's own file. (Id.) Maiorini had never contacted the insured, or conducted any independent evaluation of the claim. (Id.) This discovery by Lewis, among other things, formed the basis for Lewis's request to escalate Maiorini's Corrective Action before the end of the oral warning period, "due to the serious potential business implications of her actions." (Pl. App. Ex. 83, Bode/Lewis Email Chain, FIE 15329-15331 at FIE 15329.) Therefore, his actions were clearly based on Mariorini's performance issues.

Similarly, in the case of Reichardt, after placing her on a 30-day Written Warning on January 12, 2012, by January 24, 2012 Harmon and Lewis had accelerated Reichardt's discipline to "Final Warning." Again, the evidence reveals that after Reichardt was placed on Written Warning on January 12, 2012, Lewis discovered that Reichardt had as many as 33 claims with incomplete investigations and delayed file handling, and another six files with no activity for over two weeks. (App. Ex. 55, 1/24/12 Memo to D. Reichardt re Probation/Final Warning-Probation.), that she had left a message for a claimant with a non-working phone number (App. Ex. 56, 1/18/12 Notes of J. Lewis; App. Ex. 57, 1/17/12), and that she had failed to return several messages from a claimant's attorney. (App. Ex. 59, 1/20/12 Email from D. Reichardt to J. Lewis.), These are all extremely serious allegations that warranted action.

In sum, the undisputed evidence reveals that neither both Reichardt and Maiorini had their Corrective Actions escalated at certain times simply for the sake of expediting the termination process. On the contrary, the undisputed evidence reveals that both had their Corrective Actions escalated because instead of improving during the Corrective Active process, Reichardt and Maiorini actually compounded their situation by committing even more serious performance issues.

Plaintiffs next claim that pretext is demonstrated by the fact that Harmon created a work atmosphere at the King of Prussia office in which the older employees were ignored, disrespected and demeaned, while the younger employees we favored and welcomed into Harmon's "pajama club."

In support of this contention, plaintiffs cite O'Kane's testimony that, "When [Harmon] was in the office, she would sail past us [the AIG legacy employees]—and we were segregated in a spot—sail past us, never acknowledging us. But she did acknowledge the other ones [the Farmers' employees]. Its almost like she viewed and communicated, don't mess with them, they're not worth it. Or one could deduce, they're not going to be here that long." (Pl. App. Ex. H, O'Kane Dep. Tr. 39.)  .)  However at her deposition, O'Kane admitted that her complaint was with the way Harmon allegedly treated the "**AIG legacy**" employees, not how she treated **"older"** employees. (Pl. App. Ex. H, O'Kane Dep. Tr. 38:6-39:18.) She further admitted did not know if Harmon was dismissive or not respectful to people who had come up through the Farmers' system (as opposed to AIG) or whether Harmon was always nice to people who had come up through just the Farmers' system. (Id. at 39:19-40:20.)

Plaintiffs also cite Russell's testimony that Harmon was friends with some of the younger Claims Representatives, including  Dimeo,  Bonzcek,  Traugh and Bressi and that the sole reason

he referred to them as the "pajama party" was because "they would, like, gather in the corner of the office. It was like a teenager sleepover, you know," and "whenever I visited that office or that there was a meeting or if we had a group meeting, whether it be, like, in the cafeteria or her office, you know, before everybody got started, it was just . . . the party got together." (Pl. App. Ex. E, Russell Dep. Tr. 34:14- 35:12.) Russell elaborated that "[i]t was just pretty obvious. Like I said, you know, it was just -- you know, they got together in and out of the office. I mean, obviously, you know, they were friends." (Id. at 36:7-15.) The mere fact that in one person's view,  Harmon liked to socialize with some of the younger claims representatives is hardly evidence of pretext for discrimination against older employees.

Plaintiffs also cite Quinn's  averment  "[t]he Claims Adjustors hired by Ms. Harmon were sent to California for three weeks of training at Farmers' expense, to learn the Farmers' software programs that we were required to use to document our work product. Older claims adjustors like Ms. Maiorini and Ms. Reichardt  generally were not given this training but rather were expected to learn the program without any significant specialized training." (Pl. App. Ex. 11, Quinn Declaration at ¶ 8.)  However, Quinn later testified that she had no personal knowledge of what training was provided and that her averment was based only on comments she heard from co-workers. (Pl. App. Ex. G. , Quinn Dep. Tr. 58-59.)

Plaintiffs also cite the following raw numerical comparisons of the ages of the claims representatives in the King of Prussia office when Harmon became Pennsylvania State Manager in 2010 and when she was terminated as part of a reduction in force in 2013:

> At the time when Harmon took over as State Manager in January, 2010, sixteen of the twenty-four claims adjusters in the King of Prussia office were over the age of forty.  See Plaintiffs' Counter-Statement of Facts at ¶169.
>
> By the time Harmon was terminated in March 2013, only one adjuster in the King of Prussia office was over forty.  See id. at ¶ 170

Ms. Harmon hired nine adjusters during her tenure – seven of nine were in their twenties and the other two were in their thirties.  See id. at ¶ 171.

Eight of the nine new hires remained at the King of Prussia office as claims adjusters at the end of Ms. Harmon's tenure. See id. at ¶ 172.

In less than two and a half years as State Manager, she terminated five adjusters over forty, including both plaintiffs. See id. at ¶173.

While on the surface this evidence seems intriguing, it nevertheless falls short of demonstrating that age discrimination was more likely than not a motivating factor in Harmon's employment decisions. This is ultimately a "But for" test that the Plaintiffs can not meet. Plaintiffs have failed to present the qualifications of the nine younger adjusters Harmon hired during her tenure. Without evidence to suggest that Harmon passed over more experienced but older representatives, a reasonable jury would not be able to infer discrimination from the raw numerical comparisons of the ages of those hired and fired. See Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F. 2d 509, 542-43 (3d Cir. 1992).

It should also be noted that only three representatives over the age of 40 were actually terminated by Harmon—plaintiffs Maiorini, Reichardt who were terminated for poor performance, and David Alessio, who was terminated pursuant to a uniform company policy after he failed a required certification exam. (App. Ex. 2, Duffy Decl. ¶¶49-50.) Of the remaining 10, one individual (Mary Mullan) died; three (Maryann O'Kane, Robert McCaughan, and Jennifer Quinn) retired voluntarily; one (Karin Weaver) resigned voluntarily, and five (Darlene Barbee, Alayne Bleau, Loretta Hutchings, Deborah Massey, and Michele Young) transferred to a Farmers affiliate office in Delaware in connection with a reorganization. (App. Ex. 2, Duffy Decl. ¶¶50-54.)

Relying on the report of their Human Resources Expert, Gramigna, plaintiffs contend that Farmers (through Bode) conducted a superficial, biased and totally inadequate investigation into the age discrimination complaints of Maiorini and Barbee which plaintiffs contends could serve as additional circumstantial evidence of Farmers' hostility toward its older employers. However, Farmers' Human Resources Expert, O'Hearn, also submitted a report which concluded that "Farmers' investigation of the complaints in this matter did not deviate from any applicable standards of care." (Supp. App. Wx. 15, Report of Christine O'Hearn, 6.)  Even if a jury were to credit all of the conclusions in the Gramigna report and reject all the conclusions in the O'Hearn report, the Court finds that a reasonable jury would not have enough evidence, either alone or in combination with any other evidence, to find that Farmers' reasons for terminating plaintiffs for poor performance were pretextual.

Plaintiffs also cannot demonstrate discriminatory animus simply by pointing to positive performance reviews from former supervisors. See, e.g., Wang v. Amergen Energy Co., No. 03-CV-2123, 2004 U.S. Dist. LEXIS 15429, at *26 (E.D. Pa. July 15, 2004) ("Good evaluations of performance cannot establish that unsatisfactory evaluations are pretextual."); Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002) ("Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important."); Sullivan v. Nationwide Life Ins. Co. of Am., 720 F. Supp. 2d 483, 502 (D. Del. 2010) (finding that "past positive performance reviews are insufficient, alone to establish that [defendant's] proffered reasons for termination were mere pretext"). Thus, the fact that the supervisors plaintiffs had prior to Harmon and Lewis did not discipline either plaintiff is completely irrelevant. Indeed, it appears that once she became Pennsylvania State Manger in 2010, Harmon adopted a much stricter hands-on approach to her duties which neither plaintiff had previously experienced.

Since plaintiffs cannot establish that Farmers' actions in terminating them for poor performance were pretext for age discrimination under either prong of the Fuentes test, summary

judgment will be entered in favor of Farmers and against the plaintiffs on plaintiffs' claims for age

discrimination under the ADEA and PHRA.


### 2.   Retaliation under ADA and FMLA


    Plaintiff Reichardt has alleged a claim for retaliation under the ADA, arguing that Farmers

terminated her in 2012 after she requested a reasonable accommodation of working from home in

2010. Farmers responds that since there is absolutely no temporal proximity between her request for

an accommodation and the date she was terminated, Reichardt has failed to allege even a prima facie

case of retaliation under the ADA.. Reichardt also asserted a retaliation claim against Farmers under

the FMLA, claiming Farmers terminated her on November 7, 2012 after she made a request for

FMLA leave on January 26, 2012.

    In order to establish a prima facie case of illegal retaliation under the ADA and the FMLA, a

plaintiff must show (1) that she engaged in protected activity; (2) that she suffered from an adverse

action by the employer either after or contemporaneous with the employee's protected activity; and

(3) a causal connection between the employee's protected activity and the employer's adverse action.

Williams v. Philadelphia Housing Authority Police Department, 380 F.3d 751, 759 (3d Cir. 2004).

Farmers does not challenge the first two elements, but contends that there is no evidence from

which a jury could conclude that a causal connection exists.

    A fact finder may infer a causal connection between the protected activity and the

adverse action if the timing of the adverse action suggests it was related to the protected activity,

or if plaintiff produces evidence of ongoing antagonism on the part of the employer. Abramson

v. William Paterson College, 260 F.3d 265, 288 (3d Cir. 2001). Although temporal proximity

between the protected activity and the adverse action "can be itself sufficient" to establish a

causal link, the timing of the alleged retaliatory action must be "unusually suggestive of retaliatory motive before a causal link will be inferred." Williams, 380 F.3d at 759.  When timing is not "unduly suggestive," "timing plus other evidence" is required to establish an inference of causation. (Id.)

More than two years elapsed from the time Reichardt sought an accommodation to work from home in July, 2010 until August 23, 2012, the date she was terminated.  Therefore timing is clearly not unduly suggestive. Nor is there any evidence from which a reasonable jury could conclude that any ongoing antagonism in the form of numerous Corrective Actions issued by Farmers to Reichardt was casually related to Reichardt's decision to seek an accommodation. Daniels v. School Dist. of Philadelphia, 776 F. 3d 181, 198 (3d Cir. 2015). (Plaintiff "cannot rely on the intervening antagonism she allegedly faced because . . . she cannot show that there was a causal relationship between her protected conduct and the antagonism.") Reichardt did not receive her first Corrective Action until January 3, 2011 some six months after she made her initial request for an accommodation. Therefore, the Court concludes that Reichardt cannot establish a prima facie case of retaliation under the ADA. As discussed above, Farmers has proffered legitimate reasons for terminating Reichardt which Reichardt has failed to rebut with evidence of pretext. Therefore summary judgment will also be granted to Farmers on Reichardt's retaliation claim under the ADA.

With regard to Reichardt's claim for retaliation under the FMLA, there is no evidence from which a reasonable jury could conclude that Reichardt has established a causal connection between her requesting leave under the FMLA on January 26, 2012 and Farmer's decision to terminate her employment on August 23, 2012.  Our Court of Appeals has specifically held that "[a]n employee cannot easily establish a causal connection between his protected activity and the

alleged retaliation where he has received significant negative evaluations before engaging in the protected activity." Ross v. Gilhuly, 755 F. 3d 185, 194 (3d Cir. 2014). See,  Shaner v. Synthes, 204 F.3d 494, 504-05 (3d Cir. 2000)("In short, the record shows that Shaner's performance evaluations contained similar criticisms both before and after he made the company aware  that he suffered from MS and before and after he filed his first EEOC charge. Under these circumstances, there is simply no evidence that any of these evaluations was casually linked to the filing of Shaner's first EEOC charge or that any of them was motivated by discriminatory or retaliatory intent.").

Here, the record reveals that Farmers had already placed Reichardt on Corrective Action on January 3, 2011, April 6, 2011 and November 10. 2011. On January 12, 2012, the November 10, 2011 Corrective Action was escalated from an Oral Warning to a Written Warning and on January 24, 2012, Reichardt was placed on Probation/Final Warning.  Although Bode's notes from January 30, 2016, which was four days after Reichardt first requested FMLA leave, stated that "[m]anagement would like to term since Debbie is not participating in the Corrective Action process," the notes also mentioned that "Debbie never indicated that she needed surgery and did not request accommodation during any prior conversations."  (Id.)  The notes also indicated that "Debbie did not request the [paid time off] . . .this is against protocol." (Id.   Terminating an employee for falsifying his or her need for leave is not retaliation, nor can the request for such termination be evidence of retaliatory animus. *See* Parker v. Verizon Pennsylvania, Inc., 309 Fed. App'x 551, 563 (3d Cir. 2009) ("Just as suspected fraud or violation of company policy would be a sufficient basis to discharge an employee not on FMLA leave, it is a sufficient basis to discharge one who misuses FMLA leave.")

Even if there was evidence from which a reasonable jury could conclude that Reichardt established a prima facie case of ADA or FMLA retaliation, Reichardt would be unable to demonstrate, for reasons discussed *supra,* that Farmers' nondiscriminatory reason of poor performance for terminating her was pretext.

For the foregoing reasons, the Court finds there are no genuine issues of material fact as to whether Reichardt has satisfied the third prong of a prima facie case for retaliation under either the ADA or FMLA.